JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (applicant *pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (applicant *pro hac vice*)
csmith@law.du.edu
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA
AT IRVINE, SCHOOL OF LAW
Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian G.P.; **MAYA W.**, a minor, by and through her Guardian R.W.; **MARYAM A.**, a minor, by and through her Guardian M.T.; **ZUBAYR** | Case No.: **2:23-CV-10345**<br><br>**COMPLAINT FOR DECLARATORY RELIEF AND** |

**COMPLAINT FOR DECLARATORY RELIEF**

**M.**, a minor, by and through his Guardian S.W.; **MUAAWIYAH M.**, a minor, by and through his Guardian S.W.; **DANI R.**, a minor, by and through her Guardian A.P.; **MAYA R.**, a minor, by and through their Guardian M.R.; **MARYAM M.**, a minor, by and through her Guardian S.A.; **NOAH C.**, a minor, by and through their Guardian N.M.; **IONE W.**, a minor, by and through her Guardian C.W.; **AVROH S.**, a minor, by and through his Guardian P.S.; **ARIELA L.**, a minor, by and through her Guardian E.L.; **HUCK A.**, a minor, by and through his Guardian R.A.; **NEELA R.**, a minor, by and through their Guardian S.R.; **EMMA W.**, a minor, by and through her Guardian S.W.; **ARISHKA J.**, a minor, by and through her Guardian A.J.; **LALI H.**, a minor, by and through her Guardian R.H.; **DEAN S.**, a minor, by and through his Guardian R.K.;

        **Plaintiffs,**

        **vs.**

The **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; The UNITED STATES of AMERICA**; **MICHAEL S. REGAN**, in his official capacity as Administrator of the Environmental Protection Agency;

        **Defendants.**

**FURTHER RELIEF AS WARRANTED**

**Constitutional Rights; Declaratory Judgment Action (28 U.S.C. §§ 1331, 2201, 2202)**

**COMPLAINT FOR DECLARATORY RELIEF**

## **TABLE OF CONTENTS**

NATURE OF THE ACTION.................................................................................1

JURISDICTION AND VENUE.........................................................................5

PLAINTIFFS.......................................................................................................7

DEFENDANTS.................................................................................................31

LEGAL BACKGROUND.................................................................................32

    Defendants Exert Exclusive Sovereign Control Over the Air and
    Atmosphere ............................................................................................32

    EPA Has Delegated Authority to Protect, Not Harm, Human Health and
    Welfare...................................................................................................34

    Defendants Are Constitutionally Constrained from Denying Children
    Equal Protection of the Law...................................................................37

    Defendants Are Constitutionally Constrained from Denying Children Due
    Process of Law ......................................................................................39

STATEMENT OF FACTS................................................................................41

    Defendants Allow Climate Pollution and Know it is Dangerous to Human
    Health and Welfare ...............................................................................41

    Children are Uniquely Vulnerable to and Disproportionately Harmed by
    Climate Pollution and EPA's Conduct, and EPA Knows It ........................46

    EPA Intentionally Discriminates Against Children .....................................69

    EPA Intentionally Allows Climate Pollution at Levels Known to Harm
    Children's Health and Welfare .............................................................70

    EPA Systematically Discounts the Lives of Children .................................76

    EPA Has Disregarded the Best Science on Climate Pollution and Earth's
    Energy Imbalance .................................................................................82

CLAIMS............................................................................................................88

COUNT I: EQUAL PROTECTION VIOLATION—CHILDREN AS *SUI
GENERIS* ........................................................................................................88

COUNT II: EQUAL PROTECTION VIOLATION—CHILDREN AS A
PROTECTED CLASS .......................................................................................90

COUNT III: SUBSTANTIVE DUE PROCESS VIOLATION OF RIGHT TO
LIFE..................................................................................................................93

i

**COMPLAINT FOR DECLARATORY RELIEF**

COUNT IV: VIOLATION OF FUNDAMENTAL RIGHT TO LIFE-SUSTAINING CLIMATE SYSTEM ...................................................94

COUNT V: VIOLATION OF ARTICLE II TAKE CARE CLAUSE and SEPARATION OF POWER ...................................................96

PRAYER FOR RELIEF .........................................................98

**COMPLAINT FOR DECLARATORY RELIEF**

## NATURE OF THE ACTION

1.      Children in the United States are growing up with polluted air and a government-imposed and -sanctioned climate crisis. The climate system that is vital to ordered liberty and has fostered and supported all human life for thousands of years no longer exists because it has been destabilized by pollution from burning fossil fuels. Climate crisis is the single greatest driver of the health of every child born today.

2.      As members of the class of "Children," Plaintiffs come to this Court as the most vulnerable, unrepresented, powerless people in the Nation. Plaintiffs are actively being harmed and discriminated against by their government's affirmative allowance of dangerous levels of climate pollution. In a plea for their safety and equal protection of the law, Plaintiffs bring their constitutional claims against the United States Environmental Protection Agency ("EPA"), its Administrator, Michael Regan, and the United States federal government, each of whom is charged with controlling air pollution that harms human health and welfare.

3.      Children in the western United States regularly breathe into their lungs air polluted by toxic smoke from climate-fueled wildfires and fossil fuel operations. Alternately, Children must stay inside their homes to avoid the heat and air quality dangers posed by the climate crisis and must evacuate the safety of their homes due to encroaching climate-driven fires or floods. Children have lost homes from climate-driven fires. Children have lost weeks of education from climate change-related school closures and unsafe air quality conditions. Children cannot swim in water bodies laden with toxic algae spawned by too-warm water and must ration tap water because of unprecedented climate droughts. Children are losing the ability to practice their Indigenous, religious, spiritual, and cultural traditions. Children face shortened lifespans due to harms to their health and an accumulation of otherwise

**COMPLAINT FOR DECLARATORY RELIEF**

avoidable adverse childhood events, with lifelong consequences. Plaintiffs, as individual Children, have experienced each of these harms.

4.      Fossil fuel pollution and human-induced climate change specially harm Children and are burdening them with a lifetime of hardship. Children are harmed by the effects of the climate crisis in ways that are different from and worse than fully developed adults because Children's bodies and minds are still growing, they are still dependent on adults, they have different needs and behaviors from adults, and because of their longevity of life this century and into the next one. Yet, Children are consistently ignored, overlooked, and undervalued. At no time in our Nation's history has Congress delegated authority to any governmental agency to allow levels of pollution that are harmful to Children. Yet that is what EPA has done.

5.      Plaintiffs seek redress in this Court because, as members of a protected and disenfranchised class, they are politically and economically powerless in our constitutional democracy and cannot meaningfully participate in and influence the policy decisions that cause the climate crisis, discriminate against them, and irreversibly harm them for the remainder of their lives on Earth. They have no vote—the most important right of citizenship that helps preserve all other rights. By the time they can vote, Plaintiffs have experienced 18 years of climate injuries that they carry for the rest of their lives.

6.      Defendants will say these Children have no right to be heard, that EPA has the exclusive and unreviewable power to harm these Children, discriminate against them, and take away their right to a stable climate system that is needed to sustain their lives. Defendants will say these Children have no standing to sue and this Court has no jurisdiction because it must leave untouched the political branches' decisions on air pollution and climate crisis, because each separate permit and rule to allow climate pollution must be challenged singularly by these Plaintiffs, because of alleged effects on the whole economy, or because the problem is allegedly "too

**COMPLAINT FOR DECLARATORY RELIEF**

big." They are wrong. The greater the constitutional grievance against these disenfranchised young Plaintiffs and their class, the greater the responsibility of the judiciary to act as a check on Defendants' infringement of Plaintiffs' constitutional rights.

7.     Our government has made these types of arguments before—against Black children, against Mexican-American children, against Indigenous children, against children of unmarried parents, against children born to undocumented immigrants, against children of Japanese descent, and more—each in an effort to protect powerful status quo interests and deny disenfranchised Americans their equal rights. Courts have prohibited this type of discriminatory government conduct as violative of the very foundation of our democracy.

8.     The United States, and EPA as its delegated agent, do not have the absolute and unreviewable power to destroy the Nation or the lives of Children, including Plaintiffs. "[T]he Constitution does not condone the Nation's willful destruction."[1]

9.     Over 50 years ago, Congress and President Nixon charged EPA with the duty to protect adult and children's health and welfare from air pollution. Rather than use its congressionally-delegated authority to protect air quality and the climate system for Children by keeping national pollution to levels that protect Children's rights of equal protection of the law, including their fundamental rights, EPA forged an unlawful path by authorizing levels of climate pollution[2] that have destabilized the very foundation, and ordered liberty, of Children's lives, including Plaintiffs'. In

---

[1] *Juliana v. United States*, 947 F.3d 1159, 1175 (9th Cir. 2020) (Staton, J., dissenting).

[2] This Complaint uses the phrase "climate pollution" to refer to carbon dioxide ($CO_2$), methane, nitrous oxide, and fluorinated gases, the "greenhouse gases" that are emitted to, disposed of, and accumulate in the atmosphere by human activity.

**COMPLAINT FOR DECLARATORY RELIEF**

so doing, EPA has exceeded its delegated authority and injured the lives, health, welfare, safety, security, dignity, happiness, potential for longevity, and an open livable future of Plaintiffs, as Children, in violation of the United States Constitution.

10.    EPA's conduct in controlling the pollution that enters the Nation's air actively discriminates against Children, and these Plaintiffs, knowingly causing them disproportionate harm compared to similarly situated adults and burdening them with a lifetime of hardship. EPA explicitly and discriminatorily devalues Children when making decisions about levels of climate pollution to allow or restrict.

11.    Plaintiffs are Children living in California. They bring this declaratory judgment action under the Fifth Amendment Equal Protection and Due Process Clause, and the Declaratory Judgment Act. Plaintiffs seek, in the first instance, a declaratory judgment that as Children they are entitled to a heightened level of judicial review over government conduct that burdens them with lifetimes of hardship, that they are members of a constitutionally protected class, and that Defendants have violated their constitutional rights under the Fifth Amendment Equal Protection Clause, as incorporated by the Fourteenth Amendment, by discriminating against them. They also seek declaratory relief that Defendants have infringed their fundamental rights to life, including their personal security and happiness, and in so doing have also acted outside the scope of their delegated authority. Plaintiffs seek further relief as deemed necessary and proper to enforce a declaratory judgment after the facts are found and the legal conclusions of the district court are rendered on a full evidentiary record.

12.    Given the dire emergency of the climate crisis, Plaintiffs also respectfully plea that they be granted a swift hearing, including trial, to resolve material issues of disputed facts, on their claims and of their evidence. Fed. R. Civ. P. 57 ("The court may order a speedy hearing of a declaratory-judgment action.")

**COMPLAINT FOR DECLARATORY RELIEF**

13.     As the Chief Justice of the U.S. Supreme Court has said: "There is no better gift a society can give children than the opportunity to grow up safe and free—the chance to pursue whatever dreams they may have. Our Constitution guarantees that freedom."[3] As compared to similarly situated people who are adults, EPA has acted to discriminate against Children and to diminish their opportunity to grow up safe and free, much less pursue their dreams. Plaintiffs, as part of the protected class of Children, seek a legal remedy to right these constitutional wrongs.

## **JURISDICTION AND VENUE**

14.     This action is brought pursuant to the United States Constitution. It is authorized by Article III, Section 2, which extends the federal judicial power to all cases arising in equity under the Constitution.

15.     This action arises under the laws of the United States, involves a federal question, and this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

16.     "In a case of actual controversy within its jurisdiction, [ ] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

17.     "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

18.     A case and actual controversy exists between Plaintiffs and Defendants because in exercising sovereign and delegated statutory authority over the quality of

---

[3] *Celebrating the Constitution: Chief Justice John G. Roberts tells Scholastic News why kids should care about the U.S. Constitution*, Scholastic News, Sept. 11, 2006, at 4, 5.

**COMPLAINT FOR DECLARATORY RELIEF**

the nation's air and the pollution that enters it, Defendants have caused climate destabilization, endangered and discriminated against Plaintiffs, and caused them injuries to rights protected by the Fifth Amendment.

19.   The actual controversy lies in: (1) whether Defendants have burdened Children with a lifetime of hardship in violation of the Equal Protection Clause; (2) whether Children are a protected class under the Equal Protection Clause; (3) whether EPA has discriminated against Plaintiffs, as part of the protected class of Children, in allowing the injurious climate pollution in violation of the Equal Protection Clause; (4) whether the injurious climate pollution sanctioned and systematically allowed by EPA and the United States federal government rises to a substantive due process violation; and (5) whether EPA has exceeded its statutorily delegated authority in violation of the Constitution. The resolution of these actual controversies involves questions of scientific evidence and a factual record and cannot be decided merely as a matter of law.

20.   Declaratory and, if necessary, further relief, will redress the actual controversy because it will clarify Plaintiffs' rights as Children, protect Plaintiffs' rights from complete extinguishment, and at least partially alleviate Plaintiffs' injuries. If Defendants can continue to exercise their sovereign and statutorily delegated authority unchecked by the Constitution, with the errant belief that allowing climate pollution that destroys the air and climate system and Children's lives is permissible under the U.S. Constitution, Plaintiffs will face an insurmountable burden in securing their rights compared to adults. Many Children will succumb to physical or mental illness caused by climate change. Some will die from extreme climate events or lack of access to basic life necessities well before their given life expectancy. The gains in life expectancy over the last century are now reversing for Children born today.

**COMPLAINT FOR DECLARATORY RELIEF**

21.     Once Plaintiffs and Children reach the age of suffrage and are enfranchised, their vote on the matter of their lives and health will be ineffectual at altering the consequences of 18 years of cumulative climate pollution and early exposures to climate harms, as well as the policies established during their formative years that will abide for years to come. Children will not have an open livable future, but one where liberty and life are constrained, and property destroyed, by a dangerously destabilized climate system. A timely declaration in their favor regarding the unconstitutionality of Defendants' conduct will provide redress and reduce the risk of the ongoing harm to their rights.

22.     Plaintiffs have no adequate remedy at law to redress the harms herein, which, if left unresolved, will be irreversible and life-threatening.

23.     Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e). Plaintiffs reside in this judicial district, and the harms giving rise to the claims herein arise, in part, in this judicial district. Plaintiffs Genesis, Maya W., Maryam A., Zubayr, Muaawiyah, and Dani reside in the Western Division of this judicial district.

## **PLAINTIFFS**

24.     Plaintiff **Genesis B.** is a 17-year-old lifelong resident of Long Beach, California. Rising temperatures due to climate change are threatening Genesis's safety and decreasing her ability to learn. Genesis's home, designed for moderate temperatures that were previously typical of coastal cities in Southern California, has no air conditioning. Installing air conditioning is cost prohibitive for Genesis's family. As extreme heat days become more common in Long Beach, Genesis is unable to cool off in her home during the day. On many days, Genesis must wait until the evening to do schoolwork when temperatures cool down enough for her to be able to focus. On July 29, 2023, Genesis experienced symptoms of heat exhaustion, including a headache and bodily weakness after spending time outdoors

**COMPLAINT FOR DECLARATORY RELIEF**

on a hot day, and had to cancel her appearance to receive an award for her activism from a local youth group.

25.     Extreme heat days (measuring 95°F and above) in Long Beach, California.



26.     Without air conditioning, Genesis must keep the windows in her house open in the summer, which can be unsafe and exposes her to more pollen worsening her allergies and resulting in frequent runny nose, cough, and congestion. Ash from wildfires that are exacerbated by climate change and increasingly close to Genesis's home also blows in through her windows causing headaches, fatigue, and worsening of her allergy symptoms. Genesis wears masks to go outside in particularly bad smoke seasons, including the past two years.

27.     Genesis feels a deep connection to the earth, tied closely to her Afro-Latina and Indigenous roots. She has made substantial efforts to lessen her contribution to climate change by adopting a vegan lifestyle at the age of six and educating the public about greenhouse gas emissions. Genesis experiences climate anxiety and instead of thinking about college, she constantly worries about the climate crisis and how it will affect her future and the future of her four younger siblings. One way Genesis deals with her anxiety is by being in nature, though this becomes more difficult as climate change worsens. The heat and smoke prevent her from even taking walks near her home. In August 2023, after Tropical Storm Hilary,

8

Genesis was unable to take a family trip to the Colorado River, because the route, the I-5 freeway, flooded.

28.     Plaintiff **Maya W**. is a 17-year-old resident of Los Angeles, California. Maya was diagnosed with bronchospasms due to her asthma and must regularly use a steroid inhaler to participate in physical activities essential for her health, like soccer. Increasing interaction with wildfire smoke, driven by climate change, causes Maya to have chest pains related to her asthma and severe headaches. Maya plays soccer and would like to compete at a competitive level but is unable to do so due to her asthma. Wildfire smoke has caused practices to be cancelled in the past, which also prevents Maya from performing at her highest level. When Maya participated in PE classes, wildfire smoke forced the students to exercise inside, but on several occasions, ash lined the floor of the gym. Wildfires have also increasingly threatened Maya's grandparents' property in Burbank, a home she visits on nearly a weekly basis. While her grandparents' home has thus far been spared from fire, Maya was shocked to see her grandparents' lush backyard turned to ash by wildfires.

29.     Maya's participation in soccer is also affected by rising temperatures caused by climate change which causes her fatigue, headaches, and more loss of breath when she exercises. Maya plays soccer on turf fields that intensify the heat and cause her feet to feel like they are burning. At times, air conditioning has broken down at Maya's school making it difficult to focus due to the heat. Her school has lost power on especially hot days, which caused school cancellations.

30.     Maya started experiencing anxiety in 2020. This anxiety is worsened as she learns about climate change and experiences its effects. Maya's anxiety around climate change rises to the level of panic attacks, which she manages by engaging in therapy and climate action. Maya feels compelled to adjust her lifestyle and activities, like eating a vegan diet, choosing not to get her driver's license, purchasing reused items, reducing her consumption, and declining trips involving

9

**COMPLAINT FOR DECLARATORY RELIEF**

airplanes, to reduce her carbon footprint. Even with these outlets and lifestyle choices, Maya's anxiety persists as she thinks about her government making climate change worse. She feels like she has been robbed of the bright future adults promised her as she was growing up.

31.     Plaintiff **Maryam A.** is a 13-year-old resident of Santa Monica, California. Increasing wildfires and wildfire smoke harm Maryam's physical health and her family's safety. When Maryam is exposed to wildfires and wildfire smoke, she has difficulty breathing and her nose hurts around her sinuses. When air quality is poor due to wildfires, Maryam is unable to do activities she enjoys like biking, hiking, and enjoying time in nature. In 2019, Maryam's grandparents came to stay in Maryam's home because their house in Malibu was unlivable from being filled with ash from frequent wildfires. When they returned two months later, her grandparents' property had been partially burned and the house had to be remediated to rid it of ash and smoke.

32.     Maryam has also been impacted by the increasingly hot temperatures which cause Maryam headaches, while the dry air worsens her eczema flare-ups. The heat forces Maryam to limit her outdoor activities, including biking to school. Maryam practices Islam, and because her age, she is considering what practices of the faith she will adopt in the future. The heat makes it difficult for Maryam to fast for Ramadan and has affected her decision on whether to fast. As she looks to the future, Maryam believes that wearing a hijab would be very difficult in the heat. She also is concerned about her ability to participate in the Hajj, the pilgrimage to Mecca that is done on foot, with increasing temperatures. Maryam tries to change her daily activities to reduce water use, given the historical drought in California.

33.     Until Maryam's family recently had their roof repaired in Summer 2023, it would leak due to increasing extreme precipitation. In August 2023, Maryam had to cancel her thirteenth birthday with friends due to Tropical Storm

**COMPLAINT FOR DECLARATORY RELIEF**

Hilary. Even with the repaired roof, Maryam's home still experienced some leaks from the storm.

34.     Maryam enjoys going to Santa Monica Beach over the summer where oil spills often run onto the beach. The oil has ruined her shoes when she takes long walks along the beach. Maryam is concerned about how her future will be affected by climate change and how much she will be able to go outside due to poor air quality. She worries that the state of the planet will affect her ability to live her life and explore opportunities when she becomes a young adult, including going to college, traveling and hiking, choosing her career, and all of the small and big choices adults get to make, like starting a family and having future children. Maryam believes that her generation, and all generations after, are owed a future.

35.     Plaintiffs **Zubayr M.** and **Muaawiyah M.** are brothers, 11- and 16- years-old respectively. They are residents of Los Angeles, California and live near several oil and gas wells, including 3½ miles from a fracked well. Zubayr and Muaawiyah regularly face climate pollution from fossil fuel infrastructure as they recreate. They enjoy visiting Kenneth Hahn Park, approximately five miles from their home, once or twice a month and which is located next to an oil field. In April 2021, their ability to visit the park was disrupted by an oil leak which threatened health of residents by releasing containments in the air and water.

36.     Zubayr and Muaawiyah experienced increased rainfall in their area due to climate change. In August 2023, winds from Tropical Storm Hilary blew off a panel of the roof of their apartment building, on which they live on the top floor.

37.     Zubayr and Muaawiyah regularly experience smog, driven by fossil fuel emissions and wildfire smoke. Muaawiyah checks the air quality several times a week and has observed below average air quality on his weather app about half the time. When Zubayr and Muaawiyah visit downtown on smoggy days they have trouble breathing, coughing, and at times, eye irritation.

**COMPLAINT FOR DECLARATORY RELIEF**

38.     Zubayr and Muaawiyah have also experienced an increase of mosquitos in their area. They frequently receive mosquito bites and through the fall of 2023, they could see mosquitos on the inside walkway of their apartment building. In 2022, Zubayr developed a staph infection from a mosquito bite and had to receive medical treatment.

39.     Zubayr feels angry and sad when he thinks about how fossil fuels will increase in the future and make his future worse. Muaawiyah can feel despair for days at a time if he thinks too deeply about the climate crisis.

40.     Plaintiff **Dani R.** is a 17-year-old resident of Santa Clarita, California. Dani faces increasing extreme weather events due to climate change. Dani lives in a canyon where heavy rains in 2022 caused mudslides that caused severe damage to the foundation of her home and holes in the ceiling. The repairs on the home took a long time and cost her family $100,000 as it was not covered by homeowner's insurance.

41.     Dani has experienced extreme heat and wildfire, which are increasing in frequency and severity with climate change. Wildfire smoke and poor air quality caused severe allergies for Dani in 2021, where she was unable to attend school because of migraines, shakes, and congestion—missing about 15 days of school. Dani worked with a physician to get these allergies under control, which required taking Benadryl. Dani loses power several times a year at her home due to climate related events. In 2019, the Tick fire came very close to her house. Dani's family has housed displaced friends who have been evacuated or lost their homes to wildfires.

42.     Dani's school and community have issues with contaminated water. In the past, particularly in time of drought driven by climate change, Dani's family has struggled to find packaged water on the shelf.

**COMPLAINT FOR DECLARATORY RELIEF**

43.   Dani is an active member in her community, and frequently volunteers in climate action, works with women and children in need, and in the past, assisted in Covid relief. She has observed inequity and social issues in her community exacerbated by climate change. Dani had hoped to become a nurse practitioner in the future, but her concerns about climate change have made her shift her plans to focus on targeting climate change through non-profit work.

44.   Plaintiff **Maya R.** is a 10-year-old resident of Fullerton, California. Maya's first encounter with the threat of wildfire and smoke was when they were a baby and their parents were making plans to evacuate from their home in La Habra when it was difficult to know where to safely go. In their young life, Maya has experienced the physical discomfort of smoke from wildfires, which has harmed their ability to safely engage in outdoor activities they enjoy, like biking. Maya has been forced to stay inside at school due to ash falling and unhealthy air quality. Maya has observed burned landscapes while traveling for family vacations such as to Yosemite. Wildfire smoke and orange skies make Maya feel scared. Maya has experienced extremely high temperature days, requiring them to stay indoors at school when it is too hot for recess or lunch. Orange County experienced one of its hottest days ever in September 2022, reaching 111°F in Fullerton, where average high temperatures normally range near 85°F.

45.   Maya also experiences anxiety about the impacts of drought on the Colorado River and their water supply in Southern California. Maya feels a strong connection to animals and experiences anxiety about climate change's harm to animals and their habitat, especially birds and canines. Maya uses art to help with the anxiety they feel around climate change, and they attend events and marches whenever they can to try to have their voice heard.

46.   Plaintiff **Maryam M.** is a 15-year-old resident of Garden Grove, California. The effects of climate change are already impacting Maryam's religious

**COMPLAINT FOR DECLARATORY RELIEF**

practices. As a Muslim, Maryam feels a deep connection to Islam's call to care for both the environment and animals. She practices veganism as part of her devotion and is discouraged by governments' neglect of the earth. The increasing heat in Southern California due to climate change burdens Maryam when the month-long fast during Ramadan falls during periods of heat as it has for the last several years. The heat makes it very difficult to abstain from both food and water from dawn to dusk, which is an important part of her religious practice. Maryam also wears a hijab and conforms with other religious attire including long sleeves and long pants, which increasing temperatures make more difficult and lead to physical discomfort.

47.    Maryam faced a tropical storm warning for the first time in August 2023 when Tropical Storm Hilary, caused in part by climate change, hit Southern California. Her home was under threat of evacuation causing stress to her and her family. Along with worsening storms, wildfire and wildfire smoke have harmed Maryam's quality of life. Maryam considers her academics, and her love of mathematics, to be one of the most important aspects of her life and, in middle school, Maryam's school closed down for multiple days each year due to the threat of wildfire and wildfire smoke, interfering with her learning. Even when fires are not close to Maryam's home, she has had ash fall on her property from fires several miles away. Maryam worries for her younger brother with asthma, which is worsened by wildfire smoke, and requires their family to run air purifiers.

48.    Wildfires, smoke, and heat have also interfered with Maryam's enjoyment of family gatherings. In 2020, Maryam visited her family in Northern California for about a week and was exposed to extremely smoky air and poor air quality in addition to heat, which forced her to stay indoors. In recent years, two campsites that Maryam and her family regularly visited were burned down in wildfires. One campsite was a camp Maryam's mother used to also stay at as a child, a now-broken tradition she had passed down to Maryam and her siblings.

**COMPLAINT FOR DECLARATORY RELIEF**

49.     Maryam worries about how climate change will affect her and her loved ones in the future. She worries about immediate climate related threats to her family and friends, like those living in Pakistan who have been harmed by extreme flooding. She also worries about the long-term future and sustainability of life in California and other parts of the world. As a result of her climate anxiety, she spends her free time outside of school volunteering for youth-led climate organizations, which has left no time for a childhood of play and social time with friends.

50.     Plaintiff **Noah C.** is a 15-year-old resident of Sebastopol, California. Noah loves Sebastopol and even though they have visited other places in California and the country, Sebastopol is their favorite place and is where Noah feels a sense of connection and belonging. Noah remembers having a great childhood until they were 8-years-old, in third grade, when the 2017 Tubbs Fire started. That was the first time Noah was evacuated from their home for wildfire. Noah lost 19 days of school and ultimately had to leave the state to find safe air quality for their brother with asthma. The Tubbs Fire destroyed homes of Noah's friends and threatened their school and entire community. Noah's home was layered with smoke and ash. Noah remembers being very scared. Both Noah and their younger brother share the month of October for their birthdays. The Tubbs Fire occurred a couple of days after Noah's brother's birthday and shortly before Noah's birthday, ruining an otherwise celebratory time. While nothing had ever happened like that to Noah before, and they thought it was a one-time catastrophe, the Tubbs Fire was just the beginning. Now every year since 2017, Noah has had to be afraid every fall, especially in October—their birth month, that they will lose their house and everything they love.

51.     Again, in 2018, the Camp Fire caused five more days of school closures for Noah, and their family planned for potential evacuation. In 2019, during the Kincaid Fire, Noah had to evacuate their home once again, leaving their dogs at a neighborhood boarding, causing Noah to fear for their home and pets. Noah packed

15

**COMPLAINT FOR DECLARATORY RELIEF**

stuffed animals to take with them, knowing they might lose all of their possessions and their home. The evacuation disrupted Noah's Halloween, and they were forced to celebrate the holiday away from home and their community. Noah's school was shut down for several weeks, and they had anxiety that their school might burn down. In 2020, Noah's home was threatened again by an even closer fire, the Walbridge Fire. Noah evacuated to San Francisco and missed the first day of sixth grade at a new school. After the 2020 fire, Noah's family relocated from their farm into town for fear of future wildfires, but they are not free from danger.

52.    Noah has spent significant portions of their childhood running from fires, spending holidays in rental houses not being able to enjoy their October birthday or Halloween, from feeling constantly afraid about fire and their house burning down. Noah has witnessed their friends struggle with the impact of losing homes. Noah has also spent many days wearing masks to help protect against the inhalation of pollutants like $PM_{2.5}$, and their family has had to purchase multiple air purifiers for every room in their home to try to keep their indoor air quality safe.

53.    After the Tubbs Fire, in fourth grade, Noah began to struggle in school and with anxiety and depression for which they have sought medical treatment. Noah uses therapy, meditation, art, and sacred time in nature to help manage their climate anxiety and depression, but the ongoing harms of climate change in Noah's life make it extremely challenging. Climate change has fundamentally changed Noah's childhood.

54.    In recent years, Noah has been diagnosed with ADHD and manages that neuro-divergence with a helpful medication. However, that medication makes it more difficult for Noah to regulate their temperature and causes sensitivity to heat. Noah also has sensory conditions and hyperhidrosis, which can lead to dehydration, which is exacerbated by hot conditions. With increasing temperatures and heat waves, Noah experiences severe physical and psychological harm that has led to

16

hospitalization, which comes with great academic, social, and financial costs. Being stuck inside due to heat or smoke worsens Noah's mental state because walks outside in fresh air are an important part of their self-care.

55.    After experiencing growing trouble with breathing after years of smoke exposure, in eighth grade Noah was diagnosed with asthma, for which they use an albuterol inhaler. Noah's asthma makes it difficult for them to participate in PE class and other activities like hiking at Noah's favorite summer camp. Noah never had respiratory issues before the fires started.

56.    Every year of Noah's childhood they attend a month-long camp in the redwoods near the ocean. That ritual and place is important to Noah and their family. Now, due to Noah's asthma and heat sensitivities, Noah is afraid to participate in the camp activities, like hiking, because of the struggle to breathe when Noah's lungs flare up. Noah used to attend camp later in the summer, but they only register to go at the beginning of summer now because of fire danger and heat. Recent fires have come very close to burning down the camp and have burned the corridor and blackened the formerly green trees Noah witnesses traveling to the camp.

57.    Climate change has also increased flooding in Noah's area. In 2019, Sebastopol experienced a severe flood, closing some of Noah's favorite places in the town square. In January 2023, Noah's home was flooded after record-breaking rainfall. The ground floor of Noah's home sustained water damage that was not covered by Noah's family's homeowner's insurance.

58.    Noah loves the coastal environment and tidepools of California and wants to study marine biology one day, but knows that some marine species are dying out or moving to different locations due to the increase in ocean temperatures. This additional loss exacerbates Noah's climate anxiety.

59.    Noah's life has been frequently disrupted by the increasing wildfires, heatwaves, and flooding due to climate change. However, the physical climate harms

17

**COMPLAINT FOR DECLARATORY RELIEF**

and disruptions cause an even greater psychological harm from the fear and anxiety Noah experiences thinking about their safety and the future as climate change worsens and governments maintain the status quo. Noah has met with members of Congress to ask them to support H. RES. 259 aimed at promoting youth mental health and well-being in a changing climate, including funding school districts to help children cope with climate-related disasters. Noah felt frustrated that many politicians did not listen to them. To date, only 29 members of Congress have supported H. RES. 259.

60.     Plaintiff **Ione W.** is a 12-year-old resident of Sebastopol, California. Wildfire seasons worsened by climate change are already harming Ione's home, family, community, and way of life. In 2017, when Ione was 5 years old, she was forced to evacuate her home in the middle of the night due to the Tubbs Fire, California's most destructive wildfire at that time. Ione's family had about 15 minutes notice before evacuating, and their home was completely destroyed in the fire, losing all possessions except those in their car, and the charred swing set in their yard—the only thing remaining of the property they still own. Ione's family was fortunate to escape across the bridge that burned down behind them. Ione missed approximately one week of school and was displaced for six months. During that time, Ione had to move three times before settling into her current home, each move adding additional stress to her as a young child.

61.     Since the Tubbs Fire, Ione feels extreme anxiety around fires. During the growing wildfire seasons, she checks the color of the sky before going to bed to confirm there is no fire in the area. At age 7, Ione photographed the sunset each night on her iPod to compare against prior sunsets, looking for hints of wildfire orange, to feel calm enough to go to sleep. Ione has also worked with a therapist to develop coping skills to address her fire anxiety. Despite these measures, Ione does not feel safe, even in her own home, from September through the first heavy rain, due to the

**COMPLAINT FOR DECLARATORY RELIEF**

increasing presence of wildfires in her area due to climate change. The smell of smoke heightens her anxiety and causes extreme headaches that sometimes make it difficult to participate in school, harming Ione's health, education, and security. Ione's family has considered rebuilding on their property but is unable to do so due to the inability to insure the property as homeowner insurance companies flee California. Since 2017, Ione has evacuated her home two additional times due to the Kincade (2019) and Walbridge (2020) fires. During the 2018 Paradise fire, Ione evacuated home to escape prolonged smoke exposure. Ione's family ultimately moved to a more coastal and less forested area that should have less wildfire risk, but there is nowhere to live in their community to escape the growing wildfire season from climate change.

62.     Ione has researched climate change since third grade and believes that climate change is something that needs to be talked about and stopped. She wants to share her story of loss and fear through these claims to prevent additional harm to herself and other children by the choices her government makes.

63.     Plaintiff **Avroh S.** is a 14-year-old lifelong resident of Palo Alto, California. Avroh first had to wear a mask as a fourth grader in 2018 when the air was filled with ash and smoke from the deadliest and most destructive wildfire season in California history. Avroh was exposed to wildfire smoke that caused headaches, coughing, and discomfort, leading to the cancellation of school. In 2020 when he was in sixth grade, Avroh began regularly checking his outdoor air quality after repeatedly waking up to a sky that had turned an apocalyptic orange from yet another series of devastating wildfires. The poor air quality has made it unsafe for Avroh to go outside for months at a time, eliminating his recreational activities important for his health and wellbeing like soccer games, practices, simple daily walks, or hanging outdoors with friends. Avroh's family has canceled family vacations in other parts of California due to extreme heat and smoke from wildfires

**COMPLAINT FOR DECLARATORY RELIEF**

that cover large parts of the state. Avroh now suffers from more frequent nosebleeds that occur during periods of poor air quality and excessive heat, and has had to have a blood vessel in his nose cauterized during wildfire season. During the 2023 fire and smoke season, Avroh experienced more respiratory symptoms such as congestion, coughing, and a sore throat, which made it hard to concentrate in school. Avroh worries for his safety as each year fires burn closer to his community.

64.     Avroh has also been exposed to increasingly severe storms that have closed his school, interrupted his education, and prevented participation in activities. For example, at the start of 2023, Avroh's school was canceled for at least five days from an extreme storm event. Extreme precipitation flooded school grounds making it unsafe to access the buildings for several days. High winds from another storm in the winter of 2023 downed power lines on campus, forcing all school children to be sent home while the power lines were fixed and the power restored. Even when school was in session, parts of Avroh's school have been blocked off as unsafe because of the risk that trees weakened by storms may fall. Avroh is scared that another severe storm could send a tree crashing into his classroom in the future.

65.     Avroh feels a deep, spiritual connection to nature and grieves the sudden loss of wildlife and ecosystems that he is witnessing in Northern California due to climate change. When Avroh was 9 years old, he started a Nature Club, to do his part to clean up the environment. Avroh has known since he was 10 years old that leading climate scientists have warned we have a limited window of opportunity to avert climate disaster, and while he does what he can in his own school and home to care for himself and nature, he feels anxiety wondering whether those in power will continue to perpetuate the harm to him and future generations.

66.     Plaintiff **Ariela L.** is a 17-year-old resident of San Leandro, California and the first generation of her family to be born in the United States. Ariela feels a

deep connection to her community in San Leandro as well as her extended family and community in Oaxaca, Mexico, who she visits regularly.

67. During the August 2020 Lightning wildfires that ignited across Northern California, Ariela opened her front doors to orange skies with air thick and heavy with smoke, causing throat aches and watering eyes – an experience that now happens every year with the increasing wildfire season made worse by climate change. As part of a low-income immigrant community in San Leandro, Ariela, as well as other students in her community, is forced to suffer climate hazards compounded by social and economic burdens. For example, Ariela has had to go to school during periods of hazardous air quality from wildfires while wealthier area schools have closed. Ariela's classrooms filled with smoke, disrupting her learning, and causing Ariela and her classmates sore throats and other physical effects. Likewise, Ariela's mom has had to continue working during hazardous smoke waves because taking time off work as a preschool teacher would cause the family financial hardship.

68. Ariela has also endured heat waves, with no air conditioning at her home and in many areas of her school. Frequently, on the hottest days, the air quality is also poor from smoke and it is not safe to cool down her home with open windows at night.

69. Ariela has a large extended family in Oaxaca where she spends time. During her childhood, while in Oaxaca in her family's pueblo, Ariela experienced intense storms whose flood waters demolished homes and crops central to her family's economic wellbeing and cultural traditions. Ariela experiences anxiety over the impact of extreme weather, like storms and hurricanes, as well as heat, on maize and other crops in Oaxaca because these crops sustain her family, community, and cultural traditions. Shortly after her family lost homes and crops in Oaxaca, Ariela returned home to the Bay Area where smoke engulfed her community. Ariela recalls

**COMPLAINT FOR DECLARATORY RELIEF**

waking up at dawn to take the bus with her mom to school, breathing in toxic smoke and understanding it was not safe for her or her mom and feeling trapped in the lack of safety for herself and her family.

70.    Ariela has been a community organizer with Sunrise Movement since age 14, fighting to stop the climate crisis. She has trained students from across the country for a national campaign and has gone to D.C., participating in a demonstration in an effort to be heard by the people in power. She would like to spend time doing other activities or enjoy her hobbies, but Ariela worries about her future, her community, her life, and future generations and knows that we are running out of time, so she has foregone parts of her childhood in order to protect a livable future.

71.    Plaintiff **Huck A.** is a 13-year-old lifelong resident of Truckee, California. Huck enjoys many outdoor activities including mountain biking, cross-country running, baseball, river inner-tubing, skiing, and other winter activities, which are an important part of his childhood and development. As climate change worsens, Huck's ability to engage in these activities is being harmed.

72.    Worsening wildfires and air quality due to climate change, are commonplace in Huck's life, a symbolic beginning of the summer. Though Huck would enjoy running or biking throughout the summer and fall, the pervasive smoke during wildfire season often forces him to stay indoors. In 2021, Huck's school was closed for one week due to the Caldor fire that caused evacuation warnings for the Tahoe Truckee Unified School District. That same fire affected Huck's family's ability to safely move his ailing grandparents into their home. In 2022, hazardous smoke from the Mosquito fire, which Huck avoided only by being out of town, impacted Huck's grandma and family members who were stuck in the smoke. When Huck attends school during wildfire season, he wears N95 masks during the day at high air quality indexes. If the air quality index exceeds 150, Huck's cross-country,

**COMPLAINT FOR DECLARATORY RELIEF**

biking, and baseball practices and events are canceled, which occurs regularly. Though Huck is preparing for high school and would like to compete competitively in these sports, smoke days cause him to miss training and competition days and interfere with his performance.

73.     The Tahoe Truckee Unified School District closes schools for smoke days when AQI exceeds 400, causing Huck to miss school, and has instituted other restrictions on student activities to reduce smoke inhalation. The School District instituted this new smoke protocol in 2021 in response to the increasing number and severity of wildfires from climate change.

74.

**TTUSD Guidelines for Outdoor Activity Based On Air Quality Level**
Use your best judgment; the AQI reports do not always reflect what we see on the ground.

| AQI Value (Air Quality Index) | Level 1: 0-50 Good | Level 2: 51-100 Moderate | Level 3: 101-150 Unhealthy for Sensitive Individuals | Level 4: 151-200 Unhealthy | Level 5: 201-300 Very Unhealthy | Level 6: 301-399 Hazardous | Level 7: 400+ Hazardous |
|---|---|---|---|---|---|---|---|
| Windows/Doors | OK to Open | OK to Open | Keep Closed | Keep Closed | Keep Closed | Keep Closed | Keep Closed |
| Lunch/Breaks Outdoors | No Restrictions | No Restrictions | No Restrictions Ensure sensitive individuals are medically managing their condition.* | 15-30 minutes max with no physical activity | No Outdoor Activity | No Outdoor Activity | No Outdoor Activity |
| Recess (15 Minutes) | No Restrictions | Ensure sensitive individuals are medically managing their condition. * | Sensitive individuals should exercise or play indoors. Encouraged to move indoors if AQI exceeds 100, if possible. | Indoors Only | No Outdoor Activity | No Outdoor Activity | No Outdoor Activity |
| P.E. (1 hour) | No Restrictions | Ensure sensitive individuals are medically managing their condition. * | Sensitive individuals should exercise or play indoors. Encouraged to move indoors if AQI exceeds 100, if possible. | Indoors Only | No Outdoor Activity | No Outdoor Activity | No Outdoor Activity |
| Athletic Practices & Training and Athletic Competitions (2-4 Hours) | No Restrictions | Ensure sensitive individuals are medically managing their condition. * | **Athletic Practice** p Limit to 30 minutes per hour of practice time with increased rest breaks and substitutions Encouraged to move indoors if AQI exceeds 100, if possible. **Athletic Competitions** Increase rest breaks and substitutions per CIF guidelines for extreme heat.** Ensure sensitive individuals are medically managing their condition.* | **CT Athletic Practice** Indoors **Outdoor Athletic Competitions** Cancelled or relocated | **Athletic Practice** Indoors (monitor indoor air quality to ensure it does not exceed 150) **Outdoor Athletic Competitions** Cancelled or relocated | **Athletic Practice** Cancelled (Site Administrators have discretion to hold practice if schools remain open. Students will be monitored for health impacts) **All Athletic Competitions** Cancelled or relocated | **Athletic Practice** Cancelled **All Athletic Competitions** Cancelled or relocated |
| School Status | Open | Open | Open | Open | Open | Potential Smoke Day based on air quality outside and inside of buildings and location of school. | Smoke Day Schools Closed |

75.     At home, Huck's family has implemented evacuation plans because wildfires have been near to their home. In 2022, Huck's family received an evacuation notice while on vacation, for the Butterfield fire, creating anxiety about how to evacuate Huck's grandma who also lived in Huck's home.

**COMPLAINT FOR DECLARATORY RELIEF**

76.     Huck has been susceptible to heat exhaustion as temperatures increase due to climate change. While attending cross-country meets, Huck has had to run in the heat, causing his lungs to burn, intense sweating, and headaches. On a few occasions, Huck has been biking in his full protective mountain biking gear in high temperatures when he got a severe headache and started vomiting and spent the rest of the day trying to cool down. Huck enjoys inner tubing down the Truckee River and has noticed the water getting warmer in the summer. Some summers, the river levels are too low to float due to drought.

77.     Extreme weather events, increasing with climate change, have also affected Huck's favorite time of year, winter, and winter sports. Huck loves snow and anxiously awaits the first snowflakes. Some winters, Huck has had difficulty skiing because there were patches of dirt everywhere and little snowpack. On the other side of extreme conditions, Huck has missed school for winter weather events made more extreme by climate change. Record-setting snow in 2016-17 and 2022-23 caused several weeks of school day cancellations. In 2023, the record-setting amount of snow caused concern over school building stability, canceling school for additional days. Huck was not able to ski during this time because the snow blocked roads to the ski resorts, which also had closures. Huck is worried that as climate change worsens, he will not be able to sled or ski because the snow will disappear with rising temperatures and the altered precipitation patterns will forever change winter in the Sierra Nevada. The number of days when air temperatures averaged below-freezing has declined by almost 30 days since 1911. Not only is the snow getting heavier and concrete-like, but there are increasingly fewer days when it is even cold enough to snow. Huck lives at just below 6,000 feet in elevation. The number of average days below freezing at Huck's home are continuing to decline.

78.     Plaintiff **Neela R.** is an 8-year-old resident of Petaluma, California. Neela experiences smoky seasons every year from increasing wildfires due to

**COMPLAINT FOR DECLARATORY RELIEF**

climate change and cannot remember a year without smoke. The smoke causes Neela headaches so severe that their parents have had to pick them up early from school on many occasions. Neela also experiences stomachaches during smoke seasons. The smoke has caused Neela to miss school, camps, recess, and multiple planned family vacations in California. When Neela was very young, their family faced evacuation threats due to wildfires. Their family continues to prepare for wildfire threats, including plans to ensure the safety of Neela's aging grandparents who also live in California and have faced similar threats from smoke and fire evacuations.

79.     Neela has an autoimmune disease. There is increasing evidence of a relationship between exposure to $PM_{10}$ and the risk of developing autoimmune diseases.

80.     Neela endures increasingly extreme temperatures during the summer due to climate change. Neela feels discomfort as they participate in outdoor activities including soccer, which they sometimes must play on artificial turf that further increases the heat. Drought has, at times, dried up the creek near a friend's house where Neela likes to play. Extreme precipitation from climate change has threatened to flood Neela's home. In 2021, Neela and their parents had to dump buckets of water from immediately outside their home to prevent its flooding.

81.     Neela has a deep love for animals and nature. Neela worries that as climate change worsens it will affect their family's ability to garden the fruit and vegetables they love to eat, the safety of their pets, and local flora and fauna.

82.     Plaintiff **Emma W.** is a 16-year-old resident of La Jolla, California. Emma is a citizen of Switzerland, and a permanent resident of the United States since she was 2-years-old, with plans to naturalize into a United States citizen when she turns 18. Emma's parents are also permanent residents and as non-citizens do not vote in U.S. elections.

**COMPLAINT FOR DECLARATORY RELIEF**

83.    Emma was diagnosed in summer 2023 with exercise-induced asthma. She uses an inhaler before physical activity, including field hockey. Increasing heat due to climate change worsens Emma's asthma. Emma also experiences heat sensitivity and has nausea and exhaustion in high temperatures, which are increasing. She has had to sit out field games and practices because of heat, preventing her from competing at the high level at which she would like. Emma visits her extended family every summer in Switzerland. During these visits, Emma has lived through European heat waves and temperatures in excess of 100°F.

84.    Emma's quality of life improves when she interacts with nature and she worries about losing access to forests, which are her favorite place to be, and underwater habitats where she scuba dives, because of climate change. Emma has a generalized anxiety disorder which is triggered by extreme climate events and politicians not acting to stop climate change. This anxiety is often immobilizing and affects her ability to function at school and in her social life. While being involved in climate activism herself is a way she tries to manage her anxiety, Emma still worries about her future and the lives of vulnerable people. While she dreams of pursuing a career as a history teacher, she believes the only path she can morally take is to work against the climate crisis; because without a stable climate system, she does not have the opportunity to choose a different future. As a minor and a child of non-citizen residents, Emma feels the profound weight of not being able to vote and have decades of decisions made about her future and the climate crisis without having a voice.

85.    Emma has also noticed a large increase in mosquitos in her area and is highly susceptible to mosquito bites and allergic inflammation. Emma's open skin from scratching the bites will make her more susceptible to infection and disease.

86.    Plaintiff **Arishka J.** is a 15-year-old resident of Redwood City, California. Arishka lives close to the bay coastal line and worries about sea level rise

**COMPLAINT FOR DECLARATORY RELIEF**

driven by climate change, which could affect infrastructure near her home by 2030 under current government projections. According to the *Sea Level Rise Vulnerability Assessment* conducted in 2018 by San Mateo County, her neighborhood of Redwood Shores is likely to be flooded completely if a 100-year flood with 3.3 feet of sea level rise occurs. Arishka enjoys recreating at the beach and has noticed rising tides and erosion that have prevented her from accessing beaches that are important to her. Arishka's life is connected to the sea and coastlines, and her opportunities about where she lives and how she spends her time will be increasingly affected by rising sea levels if climate pollution continues.

87.     Extreme weather is already harming Arishka today. In late December 2022, after record-breaking rainfall, Arishka's kitchen was flooded from water flooding in from their saturated backyard and coming up through the floorboards. Because of the extreme flooding happening in other areas as well as the time of year, most contractors were unavailable to help. Arishka's family tried to reach out to contractors for over a week, but ended up having to spend hundreds of dollars and over 20 hours to repair the damage and prevent further flooding on their own.

88.     Arishka is regularly impacted by increasing wildfire and wildfire smoke. On smoky days, Arishka has trouble breathing and gets headaches. From 4th to 7th grade, her classes and sports practices were cancelled for more than a week due to wildfires or poor air quality. Safety drills at her high school, including evacuation drills for wildfires, have even been canceled due to poor air quality. On the poor air quality days, the students are forced to stay inside at school. Students had to shelter in place for two days in September 2023 alone. Arishka has had to change her plans and alter activities due to wildfire smoke, including canceling a planned beach clean-up with friends. Arishka is aware of the harm wildfire smoke can have on her health and brain chemistry and worries about how her exposure to

**COMPLAINT FOR DECLARATORY RELIEF**

wildfire smoke, which has become the norm each year in the Bay Area, is affecting her.

89.     Arishka also worries how climate change will affect her future and is concerned that the world will not be safe for future generations. She also worries about the future of her communities including vulnerable communities near her in California, as well as her extended family in India, who she fears may be affected by extreme weather conditions.

90.     Plaintiff **Lali H.** is a 12-year-old resident of Berkeley, California. For half of Lali's life, since she was six, Lali has lived with smoke season from the increasing wildfires due to climate change. Lali remembers a Tuesday in second grade when she woke up and her bedroom was red from the light outside, which was created by wildfire and smoke. Lali's mom had her wear long-sleeved clothes to protect her from the ash as they went to school where she was not allowed outside for recess, and afterward they went straight home and stayed indoors. Years before the Covid pandemic began, Lali's family was already wearing masks during periods of poor air quality from smoke. Even inside Lali's home, she cannot escape the smoke because their home is older and drafty and the back door does not close all of the way. During smoke season, Lali can smell the smoke inside her home. Smoke irritates Lali's eyes and makes her teary. She also feels physically weaker when she breathes in the smoky air.

91.     Lali has missed school because of wildfire smoke. She attended an elementary school that was also drafty and allowed smoke inside the classrooms. The school was not able to install air filtration and parents would bring in portable air filters, but still the children were in poor air quality. There were days during Lali's elementary school when teachers would teach wearing full gas masks.

92.     Often during smoke season, Lali has not been allowed outside at recess, and she would have PE at her desk in the classroom. Lali is an active child and has

28

**COMPLAINT FOR DECLARATORY RELIEF**

a harder time paying attention in class without breaks for physical activity. Both smoke and heat make it harder for Lali to pay attention in school and do her homework.

93.     Lali's family has canceled trips to visit family in India due to extreme flooding events, which were caused by climate change. They have also canceled summer vacations due to fire. The redwood trees of California are really important to Lali and she values their fire resistance and hopes they will withstand climate change. Her extended family loves to ski together in the winter for vacation, which can only happen in years when there is enough snow to go. Lali has believed adults need to stop hurting the environment since she saw a sign in second grade that said, "There is no Planet B."

94.     Plaintiff **Dean S.** is an 11-year-old resident of Lee Vining, California. Dean is a member of the Mono Lake Kutzadika'a Tribe, the southernmost band of the Northern Paiute. Dean has lived his whole life on the lands and waters of his ancestors from time immemorial. It is part of Dean's and his family's tradition to gather native food from the land, like the deer, fish, buck berries, and pine nuts. Climate change is changing the availability of these foods and harming Dean's traditional and nourishing practices. Dean has been fishing since the age of three, learned how to gut a fish when he was 7, and to say the prayers when he takes a life. In recent years, Dean has noticed a lot of dead fish and not as many native fish to catch. In 2023, Dean and his dad did not find any deer during their hunting season. There has also been a decline in buck berries over the last few seasons. The pinyon pine nuts have not been predictable and lately have been rotten. Dean and his family notice these changes from what used to be.

95.     Dean's Tribe is named after Mono Lake and the lake is a huge part of them. Kutzadika means "we ate the brine flies." When the lake is hurting, Dean and his family are hurting. Mono Lake is like medicine for Dean and his family, to heal

29

**COMPLAINT FOR DECLARATORY RELIEF**

his mosquito bites or other ailments. It is important to Dean to swim in the lake, to sing to her, and to find healing in her waters. When Mono Lake water levels are low, it becomes almost dangerous to swim there because of the higher concentration of minerals, which can cause burning. Dean knows it is important to protect nature and help Mother Earth heal, which will also heal people.

96.    In the winter of 2023, Dean lived through an extreme snowpack that trapped wild horses who died, but other years there is now very low snowpack and not enough water for the horses. Too much snow is too much water, and too hot is too little water, both of which affect the way things grow. During the hotter drier summers, some of the lakes Dean likes to swim in, like Saddlebag Lake, are contaminated with toxic algae and unsafe to be in. Dean can feel and see these changes worsening during his 11 years. Because Dean is in nature all the time, walking barefoot in the summer, tasting the snow, harvesting food from the land and waters, he notices the changes. The snow or rain used to be more predictable and now with climate change it is hard to know what will happen.

97.    One of Dean's favorite activities is playing football and he hopes to play college football one day, but his football practices have been canceled for heat and games ended early. Dean gets headaches from the heat. Dean has also had school canceled for several days due to smoke from increasing wildfires. The red skies, and thick smoke that comes inside Dean's house have increased with the increase in fires in Dean's area. Dean wants to help Mother Earth heal so that his brothers, sisters, and friends can have a healthy safe future.

98.    Plaintiffs cannot escape the air. Their lives depend on clean air. The air they breathe circulates through their bloodstream and fills their lungs so there is no clear line separating where the air ends and where they begin.

99.    Plaintiffs cannot escape climate pollution or climate destabilization. They are confined by the climate system as now degraded by Defendants, with no

**COMPLAINT FOR DECLARATORY RELIEF**

other solution but to come to the court to seek to repair the damage they have been born into, and stop additional harm by each ton of climate pollution EPA intentionally allows to enter the air.

## DEFENDANTS

100.   Defendant **United States Environmental Protection Agency** ("EPA") is the federal agency with delegated authority from Congress to prevent, control, and protect the nation's air from pollution. Some of EPA's delegated authorities, most relevant to the allegations herein, come from the Clean Air Act.

101.   The stated mission of the EPA is "to protect human health and the environment" including "clean air, land and water . . . based on the best available scientific information."

102.   Acting as the sovereign's agent, and under its delegated authorities since 1970, EPA has exercised control over the nation's air, and air pollution over international waters.

103.   In exercising control over the quality of the nation's air, EPA has intentionally allowed an accumulation of climate pollution that EPA's own documents and the best available scientific information show is harmful to the health and welfare of Children.

104.   Claiming to act under its delegated authorities, EPA has allowed and permitted substantial amounts of climate pollution to enter the air above the nation's sovereign territory since 1970. EPA continues to allow and systematically permit large amounts of climate pollution to enter the nation's sovereign air space.

105.   By and through its exercise of control over climate pollution, EPA discriminates against Children as a class by treating their lives as less valuable than adults, using discount rates that devalue the benefit to Children of controlling climate pollution, and undervaluing the hardship EPA's policies will have on Children in the coming decades.

**COMPLAINT FOR DECLARATORY RELIEF**

106.  By permitting the pollution of the air, the destabilization of Earth's energy balance, and thus the climate crisis, EPA has acted in excess of its congressionally-delegated authority.

107.  Defendant **the United States of America** ("United States") is sovereign over our nation's air space and atmosphere. In its sovereign capacity, the United States controls the climate pollution that enters the nation's air or emanates from the United States to the air above international waters. As sovereign, the United States has caused constitutionally significant amounts of climate pollution to enter the air, and levels of $CO_2$ to accumulate in the atmosphere, which have already destabilized Earth's energy balance and climate system and are causing the planet to heat. The United States Congress and President delegated authority to Defendant Environmental Protection Agency to protect and enhance the quality of the Nation's air resources to promote the public health and welfare.

108.  Defendant **Michael Regan** is the Administrator of EPA and, in his official capacity, is responsible for all policies and practices of EPA, including its ongoing allowance of climate pollution that is harming Plaintiffs.

## **LEGAL BACKGROUND**

**Defendants Exert Exclusive Sovereign Control Over the Air and Atmosphere**

109.  The United States has asserted sovereignty of, and exercised dominion and control over, the air above the nation's territory. The United States has also exercised dominion and control over the pollution that enters the nation's air space. The Supreme Court has long affirmed that except for the immediate airshed above private property, air is in the public domain. *United States v. Causby*, 328 U.S. 256, 266 (1946).

110.  At common law, adult citizens have historically had two primary forms of legal recourse against pollution: (1) the public trust doctrine to stop the substantial

**COMPLAINT FOR DECLARATORY RELIEF**

impairment of air and water, *see, e.g.*, *Nat'l Audubon Soc'y v. Superior Ct. of Alpine Cnty.*, 658 P.2d 709 (Cal. 1983); or (2) nuisance or other tort law, *see, e.g.*, Rodgers, Environmental Law: Vol. 1 Air and Water, § 1.1(A) (1986 ed.) ("[T]he legal history of the environment has been written by nuisance law.").

111.    The federal common law has been substantially narrowed over the last century and in 2011 the U.S. Supreme Court ruled that any "federal common-law claim for curtailment of greenhouse gas emissions . . . . would be displaced by the federal legislation authorizing EPA to regulate carbon-dioxide emissions"; "Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions." *American Electric Power Co. v. Connecticut*, 564 U.S. 410, 423, 428 (2011).

112.    Prior to the establishment of EPA in 1970, Congress recognized "the dangers to the public health and welfare, injury to agricultural crops and livestock, damage to and deterioration of property, and hazards to air and ground transportation, from air pollution," in the 1955 Air Pollution Control Act that provided funding for the federal government to research air pollution. In the 1955 Act, Congress delegated its "authority relating to air pollution control" to the Secretary of Health, Education, and Welfare, and the Surgeon General of the Public Health Service.

113.    Aiming to "protect the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population" and "control of air pollution," the Clean Air Act of 1963 established a federal air pollution program within the U.S. Public Health Service and authorized research into technologies to monitor and prevent air pollution. Congress again recognized "that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to

**COMPLAINT FOR DECLARATORY RELIEF**

agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation." The 1963 Act authorized the establishment of air quality criteria which were to incorporate "scientific knowledge of the effects of various pollution concentrations." Rodgers, Environmental Law, § 3.1 (citing Pub. L. No. 88-206, 77 Stat. 392 § 3(c)(2), (3) (1963)).

114.   The Clean Air Act was first amended in 1965 by the Motor Vehicle Air Pollution Control Act, which required the federal government to set standards to control the emission of pollutants from automobiles, beginning in 1968. The Clean Air Act was again amended in 1967, 1970, 1977, 1990, and 2022, but at no time has Congress delegated authority to any governmental agency to allow levels of pollution that are harmful to children. Since 1970 Congress has maintained, and reaffirmed, EPA's exclusive delegated federal authority to regulate air pollution.

### EPA Has Delegated Authority to Protect, Not Harm, Human Health and Welfare

115.   "Agencies have only those powers given to them by Congress," and Congress does not "typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). "The agency . . . must point to 'clear congressional authorization' for the power it claims." *Id.*

116.   In 1970, President Nixon proposed to Congress a consolidation of authority over pollution into one federal agency—EPA. Nixon's proposal found that "for pollution control purposes the environment must be perceived as a single, interrelated system" to coordinate an "attack on the pollutants which debase the air we breathe, the water we drink, and the land that grows our food."

117.   The prior National Air Pollution Control Administration, under the Department of Health, Education, and Welfare, was eliminated as part of the

**COMPLAINT FOR DECLARATORY RELIEF**

reorganization and consolidation proposal of pollution control to EPA. President Nixon's proposal stated the need for EPA in this way: "Because environmental protection cuts across so many jurisdictions, and because arresting environmental deterioration is of great importance to the quality of life in our country and the world, I believe that in this case a strong, independent agency is needed."

118.   In response to President Nixon's Reorganization Plan No. 3 of 1970 to consolidate the United States' responsibility to protect air and human health from pollution (among other environmental concerns), Congress approved Nixon's proposal and EPA was created as part of the Executive branch. One of EPA's most important roles was to establish and enforce environmental protection standards consistent with national goals of protecting public health and welfare and abating pollution. When created by Nixon and the 1970 Congress, EPA was not delegated the statutory authority to allow levels of pollution that would destroy the Nation or harm Children's health or quality of life.

119.   In delegating authority to EPA, Congress understood that setting national air quality standards to protect public health from hazardous pollution agents would require major action throughout the nation.

120.   Since 1970, the United States has delegated authority to EPA to protect the public health and welfare by setting national pollution control standards and regulating pollution from stationary sources like power plants and mobile sources like motor vehicles and airplanes.

121.   According to EPA, "Congress designed the Clean Air Act to protect public health and welfare from different types of air pollution caused by a diverse array of pollution sources." The primary goals of the Clean Air Act are pollution prevention and the protection of human health and welfare. 42 U.S.C. § 7401(c).

**COMPLAINT FOR DECLARATORY RELIEF**

122.   The objective of the Clean Air Act is to establish national standards for pollution from stationary and mobile sources and to ensure that states conform their territorial pollution control to those federal standards. 42 U.S.C. § 7401(b).

123.   EPA sets the national floor for air quality protection. States and Tribes may limit air pollution more stringently than EPA, but they may not allow more air pollution than does EPA. EPA oversees the conduct of states in controlling pollution emanating from within their borders and is authorized to take legal action should states not comply with federal law.

124.   Congress has delegated EPA statutory authority to systemically control pollution over the following:

a.   All stationary sources of pollution, including factories, chemical and fertilizer plants, petroleum refineries, power plants, cement plants, glass plants, and other industrial facilities;

b.   All mobile sources of pollution, including all motor vehicles, engines, and equipment including small gasoline-powered engines like generators, mowers, chainsaws, and leaf-blowers;

c.   Fuels;

d.   Locomotives;

e.   Ocean-going vessels and large ships with marine diesel engines, including ferry boats, and marine recreational equipment; and

f.   Aircraft.

125.   The Clean Air Act mandates that the EPA use best available science in setting air quality standards. 42 U.S.C. § 7408 ("Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities.").

**COMPLAINT FOR DECLARATORY RELIEF**

126.   There is no statutory language in the Clean Air Act that explicitly or implicitly gives EPA the authority to allow pollution at levels that degrade the public health and welfare and the productive capacity of the national population. There is no statutory language in the Clean Air Act that explicitly or implicitly gives EPA the authority to allow pollution from the sources it regulates at levels that discriminate against and injures Children.

127.   EPA has been delegated no authority by Congress to discount the lives of Children and future generations of Children when it exercises its authority to control air pollution.

### Defendants Are Constitutionally Constrained from Denying Children Equal Protection of the Law

128.   The Equal Protection Clause of the Fourteenth Amendment, incorporated in the Due Process Clause of the Fifth Amendment, constitutionally guarantees that no person or group of people should be denied equal protection of the law that has been enjoyed by similarly situated people or groups of people. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

129.   The Supreme Court has also long recognized Children's constitutional rights and liberties and protected Children from government action that harms them under the Equal Protection Clause. *See In re Gault*, 387 U.S. 1, 13 (1967) ("[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone."). *See also Plyler v. Doe*, 457 U.S. 202, 220 (1982); *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954); *Levy v. Louisiana*, 391 U.S. 68, 71 (1968); *Obergefell v. Hodges*, 576 U.S. 644, 646 (2015).

130.   Under the Equal Protection Clause's traditional tiers of scrutiny, laws that make distinctions based on a suspect or quasi-suspect class, such as race, or gender, are subject to a heightened standard of review. The Court accords less deference to laws making distinctions on the basis of race, national origin, or gender

37

**COMPLAINT FOR DECLARATORY RELIEF**

to ensure that these groups are not limited in their ability to participate in the political process. On the other hand, laws that do not classify on suspect or quasi-suspect classes are subject to rational basis review.

131.   The Supreme Court has not decided what level of judicial scrutiny applies to Children as a class or if that traditional framework applies to Children in Equal Protection Clause cases. Yet, the Supreme Court has afforded less deference and applied heightened scrutiny to government action that imposes lifetime hardships on children for matters beyond their control. *Plyler v. Doe*, 457 U.S. 202, 220 (1982); *Levy v. Louisiana*, 391 U.S. 68, 71 (1968); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164 (1972).

132.   This case is not an age-based discrimination case, in contrast with *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976), which is a case about a 50-year-old challenging a mandatory retirement plan. Children as a class are defined by much more than their chronological age. Children have characteristics that are different from adults. Children are in early phases of human development and are physiologically and psychologically vulnerable. Children have developing lungs, brains, and immune systems that are particularly sensitive to climate harms, and exposure to these harms can subject Children to a lifetime of hardship. While human development continues until a person's mid-twenties, Children are dependent on their caregivers, and are politically and economically powerless until at least age 18. It takes decades for Children born today to have enough political and economic power to become a political majority capable of protecting their air and climate system. Even upon growing to voting age, Plaintiffs and all Children, will remain politically burdened by the First Amendment political speech rights the U.S. Supreme Court has afforded corporations, which have outsize influence in campaigns, elections, and political processes. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

**COMPLAINT FOR DECLARATORY RELIEF**

133.   Courts only defer to government conduct aimed at protecting the well-being of young people based on their capacity as Children. However, the Court has not granted such solicitude when government conduct and laws impose lifetime hardships on Children or significant risks and injury to Children's well-being, for matters beyond their control. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 220 (1982); *Levy v. Louisiana*, 391 U.S. 68, 71 (1968); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164 (1972); *see e.g.*, *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954).

134.   Under traditional equal protection analysis, government conduct motivated, at least in part, by discriminatory intent against Children as a class, by and through government policies that purposefully value the lives of children less than adults, is a violation of the Equal Protection Clause unless the government can justify their actions under the appropriate level of judicial scrutiny. *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

135.   There is no justification by which Defendants can satisfy their burden under rational basis, intermediate scrutiny, or strict scrutiny at trial. The discrimination and profound harms attributable to Defendants' conduct, which are already occurring and will only continue to increase absent judicial intervention, are of such magnitude as to "outrun and belie any legitimate justifications" that may possibly be claimed. *Romer v. Evans*, 517 U.S. 620, 635 (1996).

### Defendants Are Constitutionally Constrained from Denying Children Due Process of Law

136.   The Due Process Clause of the Fifth Amendment provides that Defendants shall not deprive any person of life, liberty, or property without due process of law.

137.   At the time of the Nation's founding, "life" meant "enjoyment, or possession of terrestrial existence;" "condition; manner of living with respect to

**COMPLAINT FOR DECLARATORY RELIEF**

happiness;" "continuance of our present state;" and "living person." [4] The Declaration of Independence also specified the "pursuit of happiness" as a self-evident equal right central to human existence.

138.   James Madison, drafter of the Fifth Amendment, said: "Animals, including man, and plants may be regarded as the most important part of the terrestrial creation. They are pre-eminent in their attributes; and all nature teems with their varieties and their multitudes, visible and invisible. To all of them, the atmosphere is the breath of life. Deprived of it, they all equally perish. But it answers this purpose by virtue of its appropriate constitution and character." Framer Madison explained in 1818 that the balanced composition of the atmosphere and the climate system in its natural state formed the ingredients, "which fits it for its destined purpose, of supporting the life and health of organized beings."[5]

139.   Courts across the United States and globally have recognized implicit rights to a life-sustaining climate system, as part of the body of fundamental constitutional rights. *Juliana v. United States,* 217 F. Supp. 3d 1224, 1250 (D. Or. 2016) (reversed on other grounds); *Matter of Hawai'i Elec. Light Co., Inc.*, 152 Haw. 352, 360 (2023) (Wilson, J., concurring); *Navahine v. Hawai'i Dep't of Transp.,* No. 1CCV-22-0000631, Order Denying Defs.' Mot. to Dismiss at 5 (Haw. 1st Circ. Ct. Apr. 19, 2023); *Held v. Montana,* CDV-2020-307, Findings of Fact, Conclusions of Law, and Order at 92 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023); *Stichting Urgenda v. The State of the Netherlands,* No. 19/00135 Judgment ¶¶ 5.8, 6.1, 8.3.4 (Sup. Ct. Neth. Dec. 20, 2019); *Leghari v. Federation of Pakistan et al.,* W.P. No. 25501/2015, Order ¶¶ 7-8 (Lahore High Court of Lahore, Pak. Sep. 4, 2015).

140.   In addition to the enumerated rights to life, liberty, and property, the

---

[4] Samuel Johnson Dictionary (1755).

[5] James Madison, Address to the Agricultural Society of Albemarle (May 12, 1818).

**COMPLAINT FOR DECLARATORY RELIEF**

Supreme Court has long recognized unenumerated substantive due process rights to personal security, bodily integrity, and family autonomy for both adults and Children. *Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (personal security); *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997) (bodily integrity); *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 504 (1977) (right to keep one's family together); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (right to learn, practice, and transmit one's cultural and spiritual traditions); *Kent v. Dulles*, 357 U.S. 116, 125-126 (1958) (right to travel and freedom of movement).

141.   Governmental conduct that burdens fundamental rights is subject to strict scrutiny. *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 904 n.4 (1986). Under a strict scrutiny analysis, Defendants must prove their actions are "necessary to further a compelling state interest." *Id*.

## STATEMENT OF FACTS

### Defendants Allow Climate Pollution and Know it is Dangerous to Human Health and Welfare

142.   Climate pollution includes greenhouse gases that accumulate in the air: carbon dioxide ("$CO_2$"), methane, nitrous oxide, and fluorinated gases. The gas in our air that is primarily responsible for destabilizing the climate system is $CO_2$. $CO_2$ is the primary pollutant driving the climate crisis because of how much $CO_2$ is entering the air, how long it stays in the air, and because it is efficient at absorbing and emitting radiation, i.e., heat. About 80% of greenhouse gas climate pollution in the United States is $CO_2$ and a significant portion of it stays in the air for millennia.

143.   Methane is a more powerful gas at trapping heat, but it dissipates much more quickly than $CO_2$.

144.   Scientists have known since the mid- to late-1800s that $CO_2$ pollution accumulating in the atmosphere, from burning fossil fuels, would heat the planet.

41

**COMPLAINT FOR DECLARATORY RELIEF**

145.   The United States government has known since at least the White House's 1965 Report of The Environmental Pollution Panel President's Science Advisory Committee that $CO_2$ pollution would alter Earth's energy balance, heat the planet, and thereby threaten "the health, longevity, livelihood, recreation, cleanliness and happiness of citizens who have no direct stake in their production, but cannot escape their influence."

146.   In 1970, EPA's first Administrator, William Ruckelshaus, ordered EPA's Air Pollution Control Office to conduct national programs for the definition, prevention, and control of air pollution to achieve wholesome air and sufficiently define air quality to minimize and eliminate the harm from air pollution.

147.   Early in its inception, recognizing that Earth's climate is changing, EPA commissioned a report published in 1974 from University of Wisconsin's Center for Climatic Research on *Changes in the Global Energy Balance*. In 1974, scientists estimated that $CO_2$ was increasing at 1 ppm annually from human-caused pollution, when $CO_2$ was 330 ppm. In this report, EPA was advised that by 2000, atmospheric $CO_2$ would rise from 320 to 379 ppm due to fossil fuel use projections and could increase the earth's temperature by almost half a degree Celsius. Atmospheric $CO_2$ in 2000 reached about 370 ppm.

148.   In 1978, EPA reaffirmed the warning of the National Academy of Sciences ("NAS") "that continued use of fossil fuels as a primary energy source for more than 20 to 30 more years could result in increased atmospheric levels of carbon dioxide. The greenhouse effect and associated global temperature increase and resulting climate changes could, according to NAS be both 'significant and damaging.'" Atmospheric $CO_2$ in 1978 reached about 335 ppm.

149.   In 1983, EPA knew that climate pollution was continuing to accumulate in the air and would substantially raise global temperature. EPA projected a possible 2ºC (3.6ºF) increase by the middle of the 21st century, and a 5ºC (9ºF) increase by

**COMPLAINT FOR DECLARATORY RELIEF**

2100. EPA said the increased heat would result in dramatic precipitation and storm patterns and rising seas. EPA projected significant effects to agriculture and every other natural and political system and institution. EPA knew that the human habitability of certain regions would be threatened.

150.   In 1983, EPA reaffirmed a 1979 National Academy of Sciences report that warned against further delay in addressing $CO_2$ pollution. EPA summed up the $CO_2$ pollution threat: "A wait and see attitude may mean waiting until it's too late. (Charney, 1979)."

151.   In 1983, EPA recommended that a policy of banning fossil fuels could significantly reduce temperature increases by 2100. EPA suggested banning coal and oil shale.

152.   The summary of EPA's findings in 1983 were stated as follows: "our findings call for an expeditious response. A 2°C increase in temperature by (or perhaps well before) the middle of the next century leaves us only a few decades to plan for and cope with a change in habitability in many geographic regions. Changes by the end of the 21st century could be catastrophic taken in the context of today's world. A soberness and sense of urgency should underlie our response to a greenhouse warming."

153.   By 1983, four decades ago, EPA knew it had only a few decades to control climate pollution to avoid catastrophic changes to the habitability of the nation for generations of Children.

154.   In the past 40 years, EPA has continued to allow even more climate pollution to enter the nation's air than it allowed in 1983. Atmospheric $CO_2$ in 1983 reached about 343 ppm.

155.   In 1990, EPA published a report, *Policy Options for Stabilizing Global Climate*, that called for a 50% reduction in total U.S. $CO_2$ emissions below 1990

**COMPLAINT FOR DECLARATORY RELIEF**

levels by 2025 to correct climate destabilization. Atmospheric $CO_2$ in 1990 reached about 354 ppm.

156. Over three decades ago, EPA said that climate pollution can be effectively reduced thereby dramatically reducing the rate and ultimate magnitude of climate change in the 21st century.

157. The recommendations in EPA's 1990 Report were not followed by EPA. U.S. climate pollution continued to increase thereafter under EPA's control.

158. In 1992, the United States ratified the United Nations Framework Convention on Climate Change ("UNFCCC") renewing its sovereign commitment to protect the climate system for present and future generations with the primary commitment to "stabiliz[e] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." EPA remained the U.S. agency with exclusive authority to protect the air from U.S. climate pollution. Atmospheric $CO_2$ in 1992 reached about 356 ppm.

159. With growing levels of climate pollution, in 1999, a group of petitioners asked EPA to initiate rulemaking to make a formal endangerment finding under the Clean Air Act as to greenhouse gases (climate pollution). Atmospheric $CO_2$ in 1999 reached about 369 ppm.

160. Ten years later, on December 7, 2009, then-Administrator of EPA, Lisa Jackson, issued EPA's formal Endangerment Finding for climate pollution under the Clean Air Act: *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*. EPA issued its Endangerment Finding only after being sued and losing the case in the U.S. Supreme Court, in *Massachusetts v. EPA*, 549 U.S. 497 (2007). The Endangerment Finding had been in existence for many years prior to 2007 and was not published by EPA. Atmospheric $CO_2$ in 2009 reached about 388 ppm.

**COMPLAINT FOR DECLARATORY RELIEF**

161.   EPA's Endangerment Finding stated that current and projected atmospheric concentrations of greenhouse gases, in particular $CO_2$, threatened the public health and welfare of current and future generations.

162.   EPA's Endangerment Finding specifically named Children as a group of people most vulnerable to these climate-related health harms. The Administrator also specifically found that the threat to public health for current and future generations would likely mount over time as climate pollution continues to accumulate in the air, leading to worsening climate change.

163.   Also in 2009, two organizations petitioned EPA to establish a National Ambient Air Quality Standard for greenhouse gases (climate pollution) under the Clean Air Act. EPA did not respond to that petition for twelve years until January 19, 2021, when former EPA Administrator Andrew Wheeler rejected the 2009 petition on the eve of President Biden's inauguration. Upon taking office, the Biden administration retracted the denial letter, stating it was "withdrawing the denial of [the] petition [by the Trump administration], as the agency did not fully and fairly assess the issues raised by the petition. The EPA intends to further consider the important issues raised by your petition before responding." Over two years and nine months since EPA withdrew the denial of the 2009 petition, and over 14 years since the petition was initiated, EPA continues to allow approximately 6,680 million metric tons of $CO_2$ equivalents of climate pollution annually from stationary and mobile sources to enter the air without any national ambient air quality standard.

164.   EPA scientists have repeatedly recommended setting a national pollution standard for $CO_2$. EPA has refused to set a national pollution standard for $CO_2$. EPA is the only federal agency with Congressional authority to set a national pollution standard for $CO_2$.

165.   In 2013, a group petitioned EPA to limit climate pollution under Clean Air Act section 115, which governs international air pollution. Atmospheric $CO_2$ in

45

**COMPLAINT FOR DECLARATORY RELIEF**

2013 reached about 397 ppm. On information and belief, EPA did not act on this petition to limit international air pollution.

166.   In 2019, a group petitioned EPA to limit climate pollution as hazardous air pollution under section 112 of the Clean Air Act. Atmospheric $CO_2$ in 2019 reached about 412 ppm. On information and belief, EPA did not act on this petition to limit climate pollution as hazardous air pollution.

167.   In 2022, a group petitioned EPA under the Toxic Substances Control Act to phase out climate pollution. Atmospheric $CO_2$ in 2022 reached about 419 ppm. EPA denied this petition.

168.   Since the 2009 Endangerment Finding, Defendants have repeatedly stated that allowing "business as usual" climate pollution will imperil future generations with dangerous risks, including to health and welfare, and that Children were the most vulnerable to those dangers.

169.   Since the 2009 Endangerment Finding, Defendants have continued to intentionally allow and systematically permit "business as usual" climate pollution to enter the Nation's air. Defendants have systematically ignored or rejected citizen requests to control climate pollution. Defendants have systematically allowed ongoing climate pollution over which the U.S. Supreme Court has said EPA has exclusive control.

170.   EPA's Endangerment Finding is older than many of the Plaintiffs.

**Children are Uniquely Vulnerable to and Disproportionately Harmed by Climate Pollution and EPA's Conduct, and EPA Knows It**

171.   Since the early 20th century, the United States has known that environmental degradation would burden Children and future generations. In 1908, President Theodore Roosevelt said that we should leave our natural national domain to our children, increased in value and not worn out. In 1909, setting the stage to launch an initiative to protect children, President Theodore Roosevelt said: "If we of

**COMPLAINT FOR DECLARATORY RELIEF**

this generation destroy the resources from which our children would otherwise derive their livelihood, we reduce the capacity of our land to support a population, and so either degrade the standard of living or deprive the coming generations of their right to life on this continent."

172.   Every president carried forward President Theodore Roosevelt's Conference on Children and Youth and the message to specially protect Children until 1970. President Nixon was the last to host the conference.

173.   Over 100 years after President Theodore Roosevelt implored the nation to preserve essential resources for future generations, President Joseph Biden, in his March 2023 remarks at the White House Conservation in Action Summit, stated "[o]ur country's natural treasures define our identity as a nation. They're a birthright—they're a birthright we have to pass down to generation after generation. . . . [W]e owe to our children, our grandchildren, our great-great-grandchildren, and all to come what we have and what we can preserve."

174.   In the 1980s, the United States went on to lead the international effort in drafting the United Nations Convention on the Rights of the Child and then never ratified it. Only one other country on the planet has not ratified the Convention on the Rights of the Child besides the United States.

175.   For decades, EPA has recognized that Children are among the nation's most fragile and vulnerable populations. EPA has determined:

> Children can be at a greater risk to environmental hazards due to unique activity patterns, behaviors and biology. They have unique behaviors such as breast feeding, crawling and hand-to-mouth activity that may contribute to increased exposure. Children eat more food, drink more water and breathe more air in proportion to their body size as compared to adults, and the variety of the foods they consume is more limited. As children are still growing and developing, they do not respond to toxic substances in the same way as adults. For instance, their blood-brain barrier and metabolic processes are less mature. The timing of exposure to chemicals and other contaminants is critical in protecting human

47

**COMPLAINT FOR DECLARATORY RELIEF**

health. The same dose of a chemical during different periods of development can have very different consequences. Children who live in highly exposed or underserved communities may have reduced biological resilience and ability to recover from exposure to environmental hazards. With new threats and worsening conditions resulting from climate change, the EPA has a greater responsibility to provide children with heightened focus, assessment and safeguards to protect their health.

176. EPA's 2021 stated policy acknowledges that "Children's environmental health refers to the effect of environmental exposure during early life: from conception, infancy, early childhood and through adolescence until 21 years of age." EPA states that they have a "scientific understanding that children may be at greater risk to environmental contaminants than adults due to differences in behavior and biology and that the effects of early life exposures may also arise in adulthood or in later generations."

177.



**COMPLAINT FOR DECLARATORY RELIEF**

178.   Nearly two decades ago, EPA's Children's Health Protection Advisory Committee advised the EPA Administrator that climate change will disproportionately affect Children's health and that efforts to address climate change need to be substantially strengthened to protect Children.

179.   EPA has known of the harm climate change causes Children and the increased risk of harm they face. EPA has issued reports over the last several decades and made findings about the dangers of climate change to Children especially.

180.   Children are especially vulnerable to the dangers of climate change because they are still growing, they have unique behaviors different from adults, and they are dependent on their caregivers and their government, having no independent economic or political power.

181.   As stated in EPA's April 2023 *Climate Change and Children's Health and Well-Being in the United States*, "Children are uniquely vulnerable to climate change" and "[c]limate impacts experienced during childhood can have lifelong consequences." The report also highlights that overburdened children, including Black, Brown, Indigenous, and low-income children, may suffer the most severe impacts.

182.   Climate pollution causes higher temperatures and heat waves. Children are especially endangered by heat because they need more fluid per pound of body weight than adults and are less capable of controlling their environment and fluids. Children's bodies are also not as efficient at thermoregulation, or maintaining a normal internal temperature as external temperatures change, as adults. Children, especially the very young, are more vulnerable to heat-related illnesses and death. Heat waves are worsening.

183.   EPA knows that even small increases in extreme heat can result in increased deaths and illnesses. According to EPA, heat is the leading weather-related

**COMPLAINT FOR DECLARATORY RELIEF**

killer in the United States and Children are most vulnerable to heat. Black Children are at even higher risk for heat related illness and death than other Children.

184.   Increased heat exposure is particularly devastating for Children at multiple stages of development as the brains and lungs of children are not fully developed until around age 25.

185.   Climate-induced extreme heat causes fetal death. Extreme weather events can lead to low birthweight and preterm birth of babies. Infant mortality increases 25% on extremely hot days with the first seven days of life representing a period of critical vulnerability.

186.   Extreme heat places young Children at higher risk of kidney and respiratory disease as well as fever and electrolyte imbalance. Heat illness is also a leading cause of death and illness in high school athletes with nearly 10,000 episodes occurring annually. Plaintiffs Huck, Dean, and Emma have experienced physical injury from heat exposure during athletics and Emma's recent diagnosis of exercise-induced asthma is exacerbated by heat.

187.   Hotter temperatures lead to more emergency department visits for Children with heat-related illnesses, bacterial enteritis, otitis media and externa, infectious and parasitic diseases, nervous system diseases, and other medical issues. Emergency department visits for Children in the West have been increasing with higher ambient temperatures. Plaintiff Noah is extremely sensitive to heat, which has caused severe discomfort and has led to hospitalization.

188.   Heat experienced during the school year reduces learning through poor cognitive function and reduced ability to concentrate or learn. Temperature increases of 2°C and 4°C are associated with 4% and 7% reductions in academic achievement per child and projected lost future income. Plaintiffs Genesis, Maryam M., Avroh, Maya W., and Ariela have all experienced harm to their educational experiences due to excess heat.

**COMPLAINT FOR DECLARATORY RELIEF**

189.   Increasing temperatures interfere with important religious practices like Maryam M.'s ability to comfortably wear her hijab or fast during Ramadan, and Maryam A.'s plan to do the pilgrimage to Mecca on foot, which may be physically dangerous with increasing temperatures. The sacredness of Earth, and protecting her, is central to several Plaintiffs' spiritual or religious beliefs and practices.

190.   Today's climate-induced heat, and increasing heat, presents substantial risk to unborn and living Children. All Plaintiffs have altered or canceled their regular healthy activities on account of rising temperatures.

191.   The temperature trend in the United States since 1970 is increasing temperatures, due to climate pollution. Since the late 1970s, the United States has warmed faster than the global rate and the West, along with Alaska, has seen the greatest increase in temperatures.

192.   The graph depicts how the annual average temperatures in the contiguous 48 states have changed since 1895 relative to the 1960-1969 average based on National Oceanic and Atmospheric Administration (NOAA) observations.



193.   The last nine years have been the hottest, globally, in recorded human history. Temperatures in locales in the western United States have broken all records.

**COMPLAINT FOR DECLARATORY RELIEF**

Experts predict that 2023 will be the next temperature record-breaking year and is likely to be the hottest year in human history, with June 2023 the hottest June on record and July 2023 being the hottest month ever on record. Plaintiffs like Dean and Maya R. were exposed to temperatures over 100°F, which do not normally occur.

194.   Temperatures in the geographic area of the Central District of California have increased significantly since 1970 as depicted in the graph below. Since 1970, the Central District has warmed at about 0.6°F per decade whereas the contiguous United States has warmed at about 0.5°F per decade.



195.   Higher temperatures and climate changes to the water cycle will continue to lead to drier conditions, sharply increasing the risk of megadroughts lasting 10 or more years. Droughts lead to more climate-induced wildfires.

196.   Prolonged droughts pose a special threat to Indigenous Children, like Plaintiff Dean, by degrading natural elements important to their culture and traditions, like water, food sources, and vegetation. Droughts and climate fire threats also impede important tribal and ceremonial practices. Indeed, the Mono Lake Basin, home of the Kutzadika Paiute people is experiencing increased warming since 2011

**COMPLAINT FOR DECLARATORY RELIEF**

in conjunction with declining snow cover (about 28 fewer days of snow cover over the last two decades), which is causing the lake level to fall and the lake to shrink. Mono Lake has decreased in length by about 0.8 miles and in width by about 1.3 miles since the 1960s. The lake level protections set in 1994 pursuant to the Public Trust Doctrine to prevent unhealthy water diversions have not protected the lake at those levels because the hydrologic conditions since 1994 have significantly changed due to the declining snowpack in the Sierra Nevada, lower direct precipitation, and more evaporation from warmer temperatures and drought from climate change. In fact, the 2000-2021 western United States drought exceeded in severity any drought in the last 1,200 years, including the period of 900 to 1350 when droughts drove Mono Lake to extreme low levels. The continued decline of Mono Lake ("lake of the fly") will cause severe and costly impacts to human health and ecosystems, including loss of ancient brine shrimp and flies that support numerous water birds and are essential to the Kutzadika Paiute people.

197. This decline in Mono Lake comes in conjunction with glacier decline in the adjacent Sierra Nevada. Over the 20th century, Sierra Nevada glaciers lost about 56% of their area, 90-100% of which was due to human-caused climate change since at least the 1960s. Such century scale retreat of glaciers is a consequence of human-caused climate change. These glaciers have existed for more than 3,000 years, yet are projected to disappear in the coming decades with current global warming, with the Sierra Nevada becoming like the Trinity Alps of California that gained glacier-free status in 2015. Indeed, four glaciers in the Sierra Nevada recently broke up into multiple smaller ice masses while another three glaciers are no longer considered glaciers. Loss of Sierra Nevada glaciers will fundamentally alter stream temperatures, water quality, and downstream ecosystems, with glacier-fed streams running dry in late summer and some species becoming locally extinct.

**COMPLAINT FOR DECLARATORY RELIEF**

198.   Climate change-fueled wildfires are destroying the landscape upon which Indigenous Children depend for game, fish, and berries. The 2020-2021 wildfire burn area in California was unprecedented in the modern record with nearly 4.7 million acres burned, which was 10 times greater than the historical average. Fires in these two years burned 3% of the cold desert ecoregion east of the Sierra Nevada that includes Mono Lake, removing vegetation that supplies food such as berries. One-hundred vertebrate species had fire in more than 10% of their range, impacting the ability to find game. Likewise, wildfire poses a high risk to the native Lahontan Trout on the east side of the Sierra Nevada where only 3 of the 15 trout populations were ranked as having a likelihood of persistence in the climate of more than a decade ago.

199.   Wildfire danger also has an elevation dependence where the higher elevation regions of the Sierra Nevada and the high cold desert of California have had a greater increase in fire danger days and burned area relative to lower elevation regions in the state. In addition to fire, the eastern Sierra Nevada and adjacent cold desert is experiencing the greatest increase in tree mortality from climate stress and insects.

200.   Wildfires are also impacting water resources in the Sierra Nevada. Burned regions expose snow to direct solar radiation, increasing snowpack loss from sublimation and mid-winter melt events that then reduce summer stream flow. Dark, light absorbing particles supplied by wildfires cause snow to absorb more solar radiation, reducing snow cover and causing earlier snow melting. This process also reduces soil water content and vegetation, impacting the survival of bighorn sheep. Such dark particles from wildfire induce faster melting on glaciers, speeding up their demise.

201.   Increasing temperatures and declining rainfall has reduced the flow of water in the Colorado River, which is a key source of water in southern California,

**COMPLAINT FOR DECLARATORY RELIEF**

exacerbating water shortages and drought conditions. For the first time in history, the federal government is considering shutting down diversions from the Colorado River, which will harm California Children's access to water, like Plaintiffs Genesis, Maya W., Maya R., and Maryam A.

202.   Even in arid regions, increased precipitation is causing flash flooding, followed by drought. The recent 22-year-long drought from 2000 to 2021 in the western United States was the driest 22-year drought in at least the last 1,200 years. Climate pollution is responsible for at least 42% of this drought. If climate pollution had not occurred, the drought during Plaintiffs' lives would either not have been as severe or as long. The climate pollution acted as an additional heating and drying force to maintain the naturally drier years over an extended period of time when the dry years would have otherwise been interrupted by wet years, ending the drought. California's 2012-2014 drought years are also unprecedented in the last 1,200 years and are caused by climate pollution.

203.   Climate pollution causes warmer springs, longer summer dry seasons, and drier soils and vegetation which increase wildfire season length, frequency, severity and burned area in the West. The incidence of large climate fires in the western United States has increased since the early 1980s and is continuing to increase, cause profound changes to the West, and harming each of these young Plaintiffs in particularly personal ways. Climate pollution doubled the area burned by wildfire in the western United States from 1984 to 2015. Half of the burned area would not have burned without climate pollution and climate change.

204.   The largest number of acres burned annually from climate fires have all occurred since 2004, which coincides with the hottest years in the nation's recorded history. EPA predicts that with more climate pollution and more frequent and longer droughts, longer climate fire seasons and larger climate fire size will continue, increasingly exposing Plaintiffs to even more severe injuries from wildfires.

**COMPLAINT FOR DECLARATORY RELIEF**

205.   This figure shows area burned in the United States between 1983 and 2022 based on National Interagency Fire Center data. In the case of California, the increase in burn area for 1996 to 2021 relative to 1971 to 1995 is nearly all, if not entirely, due to anthropogenic climate change, with the best estimate being 172% of the burn-area increase being due to human-caused climate change.



206.   The wildfire season is longer than it ever has been. In 1970, the wildfire season in the West was from June to September. Now, the climate fire season in the West begins in March and goes well into fall. In Pacific U.S. (i.e., CA, OR, WA) forests, the fire season has increased by >40% (37 more days) from 1979 to 2019, with extreme fire weather increasing by 166%, the largest increase in any region analyzed in the world.

207.   In the Sierra Nevada Mountains of California, where Plaintiff Huck resides, the fire season has increased from less than 100 days per year on average (1981-1990) to close to 150 days (2011-2020). For the Central District of California, where Plaintiffs Genesis, Maya R., Maya W., Maryam M., Maryam A., Dani, Muaawiyah, and Zubayr live, since the early 1970s the interior portion of the district has experienced at least a 63 day increase in fire season length.

**COMPLAINT FOR DECLARATORY RELIEF**

208.   Sonoma County, where Plaintiff Ione lost her home and where Plaintiffs Ione and Noah have evacuated multiple times, has experienced numerous recent destructive climate-fueled fires including, the Nuns (55,565 acres), Tubbs (36,810 acres, 5,636 structures, and 22 deaths) and Pocket (17,000 acres) fires in 2017; the Kincade Fire (77,758 acres) in 2019; and the Walbridge (55,000 acres) and Glass (67,000 acres) fires in 2020. In the case of the Tubbs Fire, human-caused climate change increased the rate that the fire rapidly spread by 23%.

209.   Indeed, the increase in California's annual burn area over the last 50 years, including Sonoma County and the Tahoe Basin, is entirely attributable to human-caused climate change with a best estimate of 172% from anthropogenic greenhouse gas emissions.

210.   Since 2001 there is no evidence for any other forcing for the rising burn area besides human-caused climate change. The Tubbs, Kincade, and Mosquito fires all occurred in the autumn, which is a season where human-caused climate change has increased the likelihood of extreme fire weather by 40% through drying of fuels and warmer temperatures.

211.   The graph from Climate Central shows the change in the number of fire weather days from 1973 to 2021 for southeast California desert basin within the Central District of California. Over this time period, the number of hot, dry and windy days conducive for fire increased by 63 days.



**COMPLAINT FOR DECLARATORY RELIEF**

212.   The increase in aridity between 1984 and 2017 exposed an additional 31,500 square miles of western montane forests to climate fires. The greatest rise in fire elevation due to dry air is in the Sierra Nevada where Huck and Dean are threatened with increasing fire. There is greater than 99% certainty that 65% of California's drying trend, also called vapor pressure deficit or VPD, is due to human-caused climate change. The increase in severity and frequency of fires is also a result of climate change.

213.   EPA says the "wildfire crisis is a public health crisis, including significant impacts on air quality."

214.   The smoke from those climate fires includes fine particulate matter. Inhaling or ingesting even small amounts of these pollutants causes many adverse health conditions. Children are susceptible to health harms from climate fires even in utero. Wildfire smoke may cause 7,700 premature births (< 37 weeks) at 2°C of global warming. At 4°C of global warming, wildfire smoke may cause 13,600 premature births, a 92% increase in premature births attributable to wildfire smoke from 1986-2005.

215.   Children exposed to smoke and particulate matter also have higher risks of respiratory symptoms, decreased lung function, substantial eye symptoms, worsening asthma, increased sinus issues, development of chronic bronchitis, heart failure and premature death. The rate of childhood hospitalizations and emergency department visits is increasing due to climate fire smoke. Plaintiff Avroh's sinuses have been injured by repeated and prolonged exposure to smoke and heat, leading to a hospital visit and medical procedure. Plaintiffs Ariela, Arishka, Avroh, Dani, Dean, Emma, Genesis, Huck, Ione, Lali, Maryam A., Maryam M., Maya R., Maya W., Muaawiyah, Neela, Noah, and Zubayr have each experienced respiratory symptoms, sore throats, headaches, eye irritations, panic attacks, and/or other physical symptoms of smoke exposure.

**COMPLAINT FOR DECLARATORY RELIEF**

216.   Exposure to $PM_{2.5}$, a pollutant emitted from wildfires, can aggravate the occurrence and development of bronchial asthma. Since the worsening wildfire and smoke seasons in California, Maya W., Noah, and Emma have each been diagnosed with bronchial asthma or exercise-induced asthma.

217.   Even among Children who do not suffer from asthma, climate fire smoke exposures lead to decline in Children's lung functioning. California is the least healthy state in terms of air pollution in the nation. Pollution exposure to wildfire smoke in California has risen four-fold in the past decade. Current levels of air pollution in southern California have chronic, adverse effects of lung development in Children, which leads to important deficits in lung function in adulthood. Air pollution harms Children's lungs for life. Air pollution in the western United States is also shown to shorten human life through premature death and other medical harms.

218.   School closures caused by wildfires have significant negative impacts on academic performance, primarily among elementary school students. Such closures are likely to become more common in California in future years. In the 2018-19 school year, wildfires impacted 1,138,463 students across 1,911 California schools. Plaintiffs Arishka, Ione, Huck, Neela, Lali, Noah, Maryam M., Dani, Dean, and Avroh have each faced school closures from wildfire smoke that interfere with their learning and educational opportunities. Plaintiffs Ariela and Huck have had to attend school during unsafe air quality conditions, making it harder to focus or requiring N-95 masks. Plaintiff Maya W. has had PE class in a gym covered in ash.

219.   Climate fires and smoke in the West are worsening with greater smoke production and chronic exposures for Children. Exposure to wildfire smoke increases depression among some Children, including certain Plaintiffs.

220.   The map below is from the EPA and shows the change in annual burned acreage per square mile of land from 1984-2001 average to 2002-2020 average. The

**COMPLAINT FOR DECLARATORY RELIEF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

bar graph below is the same data but expressed in a graphic format.



Change in Annual Burned Acreage by State Between 1984–2001 and 2002–2020



215.   According to the EPA, California has experienced on average 3.62 more acres burned per year per square mile of land for the period 2002-2020 relative to the period 1984-2001. This is the largest increase of anywhere in the United States.

221.   Climate change also worsens other air pollution, like ozone levels. Air pollution preferentially targets Children because of their immature lungs, narrow airways, high respiratory rates, lower body weights, their outdoor activities, higher

60

level of physical activity, and a high prevalence of asthma. Children's respiratory tracts are not fully developed and air pollution permanently reduces lung development. Air pollution exacerbated by climate change is continuing to worsen.

222.   In 2023, EPA said climate change will increase the annual cases of asthma in Children by 4% at 2°C of global warming and 11% at 4°C of global warming especially in the Southwest, with low-income and Black, Brown and Indigenous children being more likely than others to develop new asthma because of particulate matter exposure.

223.   Over 8% of Children suffer from allergic rhinitis, and the ragweed pollen season in North America has grown 13-27 days longer since 1995 due to higher temperatures and greater $CO_2$ levels. Longer pollen seasons lead to more asthma episodes, doctor visits, and prescriptions for allergies for Children. Plaintiffs Genesis and Dani struggle with the combination of worsening allergies, smoke, and heat that significantly limit her activities both outdoors and indoors. Dani has resorted to medical treatment to manage her rhinitis.

224.   This graphic depicts projected impacts per year for Children due to increasing pollen exposure at 2°C and 4°C of global warming.



| Degrees of Global Warming | Prescriptions Filled for Allergies | First Doctor Visit for Allergic Rhinitis | ED Visits for Asthma |
|---|---|---|---|
| 2°C | 121,000 (101,000 to 167,000) | 41,000 (34,000 to 57,000) | 5,800 (4,800 to 8,000) |
| 4°C | 211,000 (198,000 to 224,000) | 72,000 (68,000 to 77,000) | 10,000 (9,500 to 11,000) |

**COMPLAINT FOR DECLARATORY RELIEF**

225.   In the western mountains, precipitation is falling increasingly as rain rather than snow, with early snowmelt occurring because of climate change, causing an overall reduction in snowpack each year. In 2015, Sierra Nevada snowpack reached a minimum of only 5% of the historical average. A study of tree-rings to reconstruct historical snowpack showed that the 2015 low snowpack was unprecedented in the last 500 years. The majority of the changes to winter air temperature, snowpack, and river flow trends are from climate pollution and climate change.

226.   The overall trend is that snowpack declines will continue. Until early 2022, of the area of California that historically has winter snowpack, 20-25% of the area experienced low-to-no snowpack since 2000. Low-to-no snowpack will increase with half of California's historically snowy regions having low-to-no snow winters for five years in a row by 2047 and 10 years in a row by 2057. Climate change causes extremities in terms of drought, but also unusually high precipitation years that cause flooding. The winter of 2023, which had historically high snowpack, is an example of the climate extremes caused by high $CO_2$ levels in a La Niña year. Plaintiff Huck experienced 30 days of school closures due to the extreme snowpack near his home, but in many winters of his childhood Huck has not been able to participate in his winter snow activities because of lack of snow. The consequence of unusually high snowpack combined with earlier warm temperatures and rain on snow causes extreme flood events that harm lower elevation areas in California. The flooding of Mono Lake affected Dean.

227.   As illustrated in the figure below, the area of snowpack and the thickness of snowpack in California is significantly decreasing.

**COMPLAINT FOR DECLARATORY RELIEF**



228. Under the climate conditions in which human civilization developed, a large snowpack or glacier acts as a supplemental reservoir or water tower, holding a great deal of water in the form of ice and snow through the winter and spring and releasing it in the summer when rainfall is lower or absent. The water systems of the western U.S., particularly in California and Oregon, heavily rely on this natural water storage. Yet as temperatures increase, not only will these areas lose this supplemental form of water storage, but severe flooding is also likely to increase as rainfall accelerates the melting of glaciers and snowpack.

229. Scientists predict a coming water supply crisis for the western United States. Indeed, all glaciers within the California Trinity Alps disappeared after the 2015 warm summer and extremely low snowpack. The glaciers on Mount Shasta are rapidly receding as are all glaciers in the western United States. The Sierra Nevada are projected to be glacier-free by 2050, where glaciers have existed for more than 3,000 years. California will soon be a glacier-free state, especially if climate pollution continues.

230. During droughts in the West, groundwater pumping increases and results in dramatic groundwater-level declines that lead to worsening groundwater

**COMPLAINT FOR DECLARATORY RELIEF**

quality. Plaintiff Noah relies on groundwater, which is diminishing.

231.    Changes in water supply and water quality is also harming agriculture and farming in the West. Increased heat, water shortages, and associated issues such as pests, crop diseases, and weather extremes including fires, hurt crop and livestock production and quality. Climate pollution is threatening food security and will decrease crop yields, increase crop prices, decrease nationwide calorie availability, and increase malnutrition.

232.    Climate change threatens the basic requirements for protecting Children's lives like clean air, pure water, sufficient food, and adequate shelter.

233.    Climate pollution leads to an increase in the frequency, severity, and duration of extreme weather events, which can injure, kill, or displace Children and their families, and damage or destroy their homes and schools. Plaintiffs Ariela, Dani, Arishka, and Noah have experienced the loss of extreme flood events on their families' homes, and for Ariela, her family's crops. Plaintiff Avroh's school has been closed from extreme flooding and storm events making his school unsafe. Ione's community flooded one year after a large fire displaced people. Muuawiyah and Zubayr suffered roof damage from Tropical Storm Hilary and many Plaintiffs received flash flood warnings during the storm.

234.    In urban areas in particular, climate-driven flooding destroys infrastructure Children depend upon, increases pollutant exposures, and increases drowning dangers. The EPA has found 200,000 additional Children may need to evacuate their homes due to inland flooding at 2°C of global warming, and 550,000 at 4°C of global warming. Further, coastal flooding is expected to destroy the homes of 185,000 children at a sea level rise of 50 cm above current levels, and the homes of 1.13 million children at sea level rise of 100 cm above current levels. Coastal flooding will also raise groundwater levels. In the San Francisco Bay, 5,282 contaminated sites will be inundated by groundwater at 1 m of sea-level rise (3,964

**COMPLAINT FOR DECLARATORY RELIEF**

sites at 0.5 m of sea-level rise) while 24% of California's superfund site area is at risk from sea-level driven groundwater inundation. Fifty-five percent of the residents near these contaminated sites are Black, Brown, and Indigenous.

235.   The increase in temperatures along with extreme precipitation and flooding is increasing the prevalence of mosquitos and infectious diseases. Children, who spend more time outside and have more open skin wounds are more susceptible to mosquito bites and contracting water-borne diseases. Zubayr and Emma have experienced these harms.

236.   Climate pollution is causing a mental health crisis for Children. Extreme events caused by climate change are traumatic for Children and cause depression, anxiety, and post-traumatic stress. The chronic worry about climate change also harms the mental health of Children. Children experience anxiety from the betrayal of their government in causing climate crisis and not protecting the air and climate system. The toxic stress from these mental health harms can last into adulthood and diminish a child's prospects for healthy adulthood. EPA has acknowledged that climate change puts Children at particular risk for distress, anxiety, and other adversities to their mental health. Every one of these young Plaintiffs lives with some level of climate anxiety, chronic worry, post-traumatic stress, and or depression. Some have diagnoses and seek treatment from therapy where they spend time talking about climate change.

237.   EPA and mental health experts have identified "climate anxiety" among Children as a chronic stressor that will have adverse effects on Children's lives. Experts opine that the mental health harms of climate change to Children are akin to cruel, inhuman, and degrading treatment (i.e., the equivalent of torture) because of the mental suffering Children are already experiencing at existing levels of climate pollution. EPA has acknowledged that Children that understand the likelihood of experiencing climate change effects throughout their lives are more

**COMPLAINT FOR DECLARATORY RELIEF**

predisposed to experiencing climate anxiety and feel hopelessness and trauma. Government betrayal, by continuing to allow the crisis to unfold unabated is also highly linked to the climate anxiety Children are uniquely experiencing.

238.   EPA knows that climate change causes harm to Children's mental health.

239.   Childhood is a condition of life when a person is most susceptible to psychological damage. Childhood trauma can have long-term mental health impacts because Children are more likely to maintain those traumatic memories with greater clarity. The disturbances in childhood from climate crisis can also harm brain development and permanently and adversely affect the prefrontal cortex, with lifelong adverse consequences that impact learning.

240.   Children will also suffer disproportionate harm from the increased financial burdens climate crisis poses, including lost property values and increasing costs from catastrophic events and harm.

241.   Black, Brown, and Indigenous Children (referred to by EPA as "BIPOC Children" and "Children of Color") are the most vulnerable because their families and communities often lack the resources for adequate shelter, air conditioning, air purifiers, and other ways of escaping from heat, climate fires, and air pollution. Black, Brown, and Indigenous Children disproportionately live proximate to fossil fuel infrastructure and the source of climate pollution, which further exacerbates their immediate exposure to dangerous air and water pollution, harming their developing bodies. Climate change also threatens the lives and health of Children by reducing food availability and increased prices, leading to food insecurity within households with fewer resources.

242.   Black, Brown and Indigenous Children's injuries from climate pollution are compounded by the historic racism and discrimination experienced by their ancestors and parents as well as the ongoing systemic racism they have been

**COMPLAINT FOR DECLARATORY RELIEF**

born into. These Children, including many of these Plaintiffs, are the most vulnerable of the Children class.

243. Black and Brown Children in California are exposed to more air pollution in general than white persons. California's average disparities between racial minority populations and non-Hispanic white populations are notably larger than other states (on average, 6 times larger). In general, Black and Brown communities bear a "pollution burden" of 56% and 63% excess exposure relative to their consumption of goods and services resulting in pollution.

244. Black and African American Children are 34% more likely to live in areas highly impacted by climate change. And they are at higher risk of childhood asthma diagnoses compared to other Children.

245. Adverse childhood experiences ("ACEs") increase the likelihood of cumulative trauma that leads to mental and physical illness, as well as an increased risk of early death. The more ACEs children experience, the greater the risk of lasting effects on health (increased risk of obesity, diabetes, heart disease, depression, strokes, chronic pulmonary disease), behaviors, and life potential. Exposure to climate pollution and climate change increases the ACEs for these Plaintiffs and Children.

246. Experts agree that "[a] child born today will experience a world that is more than four degrees warmer than the pre-industrial average, with climate change impacting human health from infancy and adolescence to adulthood and old age. Across the world, children are among the worst affected by climate change."

247. The U.S. 2023 Fifth National Climate Assessment Summary confirms that Children born in 2020 will suffer disproportionate harm from climate pollution than an adult who was born in 1960.

**COMPLAINT FOR DECLARATORY RELIEF**



248.   Experts agree with EPA and have documented the disparity in harm that Children born today will experience as compared to adults as depicted in the graphic below. Specifically, Children will experience vastly more severe weather events than living adults and prior generations.



**COMPLAINT FOR DECLARATORY RELIEF**

**EPA Intentionally Discriminates Against Children**

249.   While EPA fully recognizes the disproportionate harm of climate pollution and climate change to Children, it has actively discriminated against Children by systematically allowing climate pollution for decades at levels that harms Plaintiffs' health and welfare, by disregarding best available science on climate pollution and Earth's Energy Imbalance, and by discounting the lives of children in its regulatory analyses.

250.   EPA has known for decades that the continued emission of greenhouse gases into the atmosphere would be harmful to children, yet it continued its systemic conduct in allowing pollution that has favored fossil fuel industry and corporate-person's interests and adults over Children's health and welfare.

251.   The lobbying power and campaign contributions of fossil fuel interests have influenced Defendants' decisions to allow climate pollution to continue at current levels, irrespective of every scientific recommendation from EPA since the 1970s that climate pollution must be significantly reduced.

252.   There is a long history of presidential administrations that directed EPA to allow climate pollution and avoid controlling climate pollution.

253.   Presidential administrations have stopped EPA from controlling climate pollution for fear of their political party losing elections.

254.   On information and belief, EPA has been pressured by the Department of Justice, EPA's General Counsel's office, and White House counsel to not control climate pollution to the extent necessary to protect Children.

255.   On information and belief, EPA has been pressured by the Office of Management and Budget and the Office of Information and Regulatory Affairs to not control climate pollution to the extent necessary to protect Children.

256.   EPA knows its systemic management and control of climate pollution has discriminated against Children, including Plaintiffs.

**COMPLAINT FOR DECLARATORY RELIEF**

**EPA Intentionally Allows Climate Pollution at Levels Known
to Harm Children's Health and Welfare**

257.   Between 1751 and 2021 the United States emitted approximately 25% of the world's cumulative $CO_2$ pollution to the air, more than any other country to date. Most of United States $CO_2$ pollution has been emitted since 1970, when EPA was created. The United States is the nation most responsible for the climate crisis and its cumulative greenhouse gas emissions far exceed those of other nations such as India and China.

258.   EPA provides a comprehensive accounting of U.S. greenhouse gas emissions and sinks by source, economic sector, and greenhouse gas going back to 1990 in their annual report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks*. Since at least 1990, EPA has been aware of the relative contributions from different sources of climate pollution, which are under its regulatory jurisdiction, in the United States.

259.   Despite fluctuations in the past three decades, U.S. climate pollution is still close to what it was in 1990. Eighty percent of climate pollution in the U.S. is $CO_2$, largely from the power generation and transportation sectors, sources directly under EPA's control. More than 90% of $CO_2$ pollution is from fossil fuels from sources under EPA's control.

260.   With climate pollution already recognized by EPA to be at levels that threaten the public health and welfare of current and future generations, the U.S. Energy Information Administration ("EIA") forecasts that energy-related $CO_2$ pollution from sources under EPA's control will remain at 99% of 2023 levels in 2024, with total U.S. energy-related $CO_2$ emissions in 2050 projected to be only about 19% lower than the amount in 2022.

261.   Between 1970 and 2021, the United States, under EPA's regulatory control and permitting of climate pollution, has been responsible for intentionally

**COMPLAINT FOR DECLARATORY RELIEF**

allowing approximately 422,000 million metric tons ("MMT") $CO_2$ pollution to enter the nation's air from within its territories as depicted in the graph and chart below.

| | | U.S. Annual $CO_2$ Pollution Emissions (MMT) | Cumulative U.S. $CO_2$ Pollution (MMT) | U.S. Annual Greenhouse Gas Pollution Emissions (MMT $CO_2$ equivalent) |
|---|---|---|---|---|
| Year | Historical Moments | Total | Total | Total |
| 1970 | U.S. creates EPA to control air pollution | 4,340 | 154,000 | Data unavailable |
| 1983 | EPA Report: *Can We Delay A Greenhouse Warming?* | 4,429 | 215,000 | Data unavailable |
| 1990 | EPA Report: *Policy Options for Stabilizing Global Climate* | 5,122 | 249,000 | 6,487 |
| 2009 | EPA issues Endangerment Finding | 5,483 | 358,000 | 6,841 |
| 2021 | Most recent data on annual U.S. $CO_2$ pollution | 5,032 | 422,000 (274% increase since 1970) | 6,340 |

262.   Based on its own data, EPA has continued to authorize high levels of climate pollution in the past thirty years, resulting in a sustained annual rate of climate pollution with some highs and lows that never drop below 6,350 MMT $CO_2$ equivalent a year until the 2020 pandemic that had 6,026 MMT $CO_2$ equivalent emitted and in 2021 when the country was still recovering from the pandemic and emitted 6,340 MMT $CO_2$ equivalent.

263.   This graph shows EPA-reported U.S. climate pollution between 1990 and 2021.

**COMPLAINT FOR DECLARATORY RELIEF**



264.   In December 2023, EPA issued a new rule to reduce the amount of methane pollution it allows due to leakage from fossil fuel infrastructure and operations. EPA claimed the rule would reduce allowable methane emissions by 80% between 2024-2038. Existing fossil fuel infrastructure sources of pollution will have five years to comply with the rule and can continue operating with existing levels of pollution from operations and extracted fuels during that timeframe. Even if the rule is fully implemented, the pollution avoided is a small fraction of the overall climate pollution EPA allows to be released from the fuels extracted through this infrastructure. Based on projections for the oil and gas extracted via the sources subject to the rule, even by reducing leakage emissions, the rule only reduces total pollution from fossil fuel extraction and operations by approximately 2% between 2024 and 2038 as fossil fuel extraction continues to increase.

265.   EIA's reference case for extraction through 2050 of crude oil (left) natural gas plant liquids (middle) and natural gas (right) with their cumulative combusted emissions for 2024-2038 labeled.

**COMPLAINT FOR DECLARATORY RELIEF**



266.   EIA's 2024-2038 extraction emissions and EPA's operational methane emissions with and without the EPA's new rule are illustrated in this graph.



267.   Since the EPA was founded, national $CO_2$ emissions increased to a peak in 2005 of 6132 MMT $CO_2$. Since then, emissions decreased slowly, with the largest decline during the 2020 pandemic largely due to less travel, and have rebounded again to 5586 MMT $CO_2$ in 2021.

**COMPLAINT FOR DECLARATORY RELIEF**

268.



269.   Cumulatively, under EPA's control and authority, the United States has been responsible for about 271,922 MMT of $CO_2$ from 1970 to 2021, which is 1.85 times more $CO_2$ than the U.S. emitted cumulatively in the 169 years prior to the creation of the EPA (149,985 MMT of $CO_2$ from 1800 to 1969).

270.



271.   International scientific consensus estimates that every 1,000,000 MMT $CO_2$ emitted causes 0.45°C (0.81°F) of global warming. Based on that calculation,

74

**COMPLAINT FOR DECLARATORY RELIEF**

the EPA has allowed about 0.22°F of global warming since 1970 from carbon dioxide emissions alone, which is about 10% of Earth's global warming to date. For comparison, U.S. total $CO_2$ emissions to date have caused 0.34°F of global warming since the 1800s.

272.   EIA projects climate pollution will continue at current levels in the United States in 2024. The EIA also projects continued climate pollution through 2050, with 2050 pollution being about 81% of 2022 pollution. This continued climate pollution would add another 0.18°F of global warming on top of the U.S.-$CO_2$-caused warming of 0.22°F since 1970. EPA intentionally allows that level of climate pollution.

273.   Had Defendants banned climate pollution from coal and oil shale in 1983 as was recommended in EPA's 1983 Report, *Can We Delay A Greenhouse Warming?*, $CO_2$ pollution today could have been 47.2% less since 1983. The graph below depicts this with the blue-dotted line.



274.   Had EPA heeded its own 1990 Report, $CO_2$ pollution today could have been 30.5% less since 1990. The graph above depicts this with the purple-dotted line.

**COMPLAINT FOR DECLARATORY RELIEF**

275.   EPA ignored its own plans from three decades ago and continues to intentionally allow levels of $CO_2$ pollution that it knows are harmful to Children's health and welfare.

276.   Instead of pursuing their own plans and recommendations to decrease climate pollution, or responding to citizen petitions asking the agency to use its authority to limit climate pollution, and consequently reduce the harm to Children's health and welfare from climate change, Defendants knowingly acted, and continue to act, to exacerbate the climate crisis. Defendants exercise their control and dominion over the air in a systematic manner that caused, and continues to cause, significant harm to Children, born and unborn, including these Plaintiffs.

277.   Defendants' conduct constitutes intentional discrimination against Children.

**EPA Systematically Discounts the Lives of Children**

278.   The economic method of discounting is a weapon of intergenerational oppression that harms Children.

279.   In deciding whether and how to control pollution, EPA performs regulatory impact analyses ("RIAs") to look at how it should value benefits and costs that arise at some future date relative to those that occur today.

280.   In its RIAs, EPA gives less value to future benefits of climate pollution control than to current benefits. The devaluation of future benefits is done through the application of "discount rates." Discount rates act as intentional and explicit discrimination against Children.

281.   In conducting cost-benefit analyses of its climate pollution control programs, EPA has used and continues to use in a systematic manner discount rates that devalue the rights and interests of Children and all future generations of Children.

**COMPLAINT FOR DECLARATORY RELIEF**

282.   From 1980 to 1986, EPA exclusively used a 10% discount rate. It continued to use discount rates as high as 10% until 1994. In the 1990s, nearly all of EPA's discount rates were between 3% and 7%. From 2004 to 2010, EPA exclusively used discount rates of 3% and 7%.

283.   Applying a 10% discount rate to the cost of a program to save lives results in a life today having the same value as 117 lives in 50 years and 13,781 lives in 100 years, resulting in a valuing of one life today more than thousands in the future. Looked at another way, a proposed regulation that will generate $100 in benefits in 50 years is worth only $61 in present value using a 1% discount rate, $14 at 4%, $3 at 7%, and less than $1 at 10%.

284.   Since 2010, EPA typically uses four discount rates to analyze the costs and benefits of policies to regulate climate pollution: 2.5%, 3%, 5%, and 7%. Each of these discount rates is too high and leads to low estimations of the social costs of climate pollution (also called the "Social Cost of Carbon"), and specifically the costs to Children.

285.   Since the effects of climate pollution are long-lasting and cumulatively worse over time, using a discount rate in a cost benefit analysis on climate pollution says that what happens in the future to Children does not matter as much as the cost of controlling the future effect today, which biases public decision making against Children. The full benefits from controlling climate pollution today may not accrue for many years after society incurs costs to limit the pollution.

286.   Even a small change in the discount rate can have large effects on present values. Using a 1.4% discount rate, after 36.5 years, future people are worth just three-fifths of a person's worth today. With a 3% discount rate, a future person just 17 years from now is worth three-fifths of a person today.

287.   Defendants' policies that discount the future of Children at inappropriately high rates, which they have no statutory authority to implement,

**COMPLAINT FOR DECLARATORY RELIEF**

continue to steer EPA and the United States on the path of incalculable losses and harm to Children, and away from a constitutionally-compliant course.

288.   EPA's current and historical decision-making practices based on discriminatory discount rates lead to outcomes that impose undue burdens on Children, such as the harms the Plaintiffs are experiencing which they will carry throughout their lives.

289.   The discount rates EPA has used in its RIAs, and continues to use, purposely devalue the long-term harm of climate pollution, and the benefit of controlling and abating that pollution, on Children. The decades-long systemic pattern and practice of using discount rates that discriminate against Children has contributed to decisions by EPA that have allowed and continue to allow high levels of climate pollution to enter the air.

290.   The discount rates EPA uses also underestimate the economic benefits of controlling climate pollution for Children. As a result, EPA's analyses underlying their climate pollution decisions undervalue the benefits of climate action for Children living today and unborn Children of tomorrow, thereby marginalizing an entire class of people as compared to the living population of adults who have both economic and political power to influence those decisions.

291.   In 2021, EPA issued two proposals regarding climate pollution and each RIA continued to apply discriminatory discount rates of between 2.5% and 7%, skewing the true costs of climate pollution and the true benefits of controlling climate pollution for Children and future generations of Children.

292.   Experts state that EPA's discount rates result in policies that require less control of climate pollution because the true benefits of controlling climate pollution, and the costs of not doing so, on Children are not analyzed or disclosed publicly.

**COMPLAINT FOR DECLARATORY RELIEF**

293.   In November 2022, EPA issued a draft *Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* in conjunction with its revised proposed rulemaking for standards of performance for stationary sources of climate pollution in the oil and gas sector. EPA conducted a new sensitivity analysis using discount rates of 1.5%, 2%, and 2.5% to set the social cost of carbon and evaluate the economic impact of the proposed rules to limit climate pollution. The use of those three discount rates and the resulting social cost of carbon caused EPA to again underestimate the damages from climate pollution and the benefits of abatement. In its report, EPA wholly disregarded the effect of its discounting practices on Children, who are not mentioned in the entire *Report on the Social Cost of Greenhouse Gases.*

294.   In April 2023, the Office of Management and Budget proposed that federal agencies use a discount rate of 1.7%, yet acknowledged: "Future citizens and residents who are affected by such choices cannot take part in making them, and today's society must act with some consideration of their interest. Some believe that it is ethically impermissible to discount the utility of future generations. That is, government should treat all generations equally."

295.   In 1987, EPA contemplated adopting a zero or negative discount rate when analyzing controlling pollution that caused the hole in the stratospheric ozone layer. EPA understands that a discount rate "may be positive, negative, or zero . . . . From a social perspective, the value of this . . . discount factor reflects one's resolution of some of the ethical considerations discussed above. A zero utility discount factor weighs current and future utilities equally. A positive (negative) value weights future utilities lower (higher) than current utility." The "ethical considerations" that EPA stated were relevant to choosing a discount rate were that "the parties who will bear the costs or enjoy benefits may not yet exist"; "the unregulated market will probably not result in the optimal level of saving for the

**COMPLAINT FOR DECLARATORY RELIEF**

future"; "[i]rreversibility of the consequences of some policies is . . . a reason for adopting a more cautious attitude toward imposing burdens on future generations"; it is only justified to "borrow[] from future generations to benefit the present" only if "[f]uture generations may be richer than existing ones"; "[t]he current generation should treat future generations as they treat themselves"; "[t]he current generation should treat future generations so as to improve their life from current conditions"; and "[t]he current generation should not discount future lives, since human life is not fungible."

296.   EPA's own guidance documents indicate that the discount rates should be lower when evaluating programs implicating climate pollution, climate change, and Children. Yet EPA continues to apply discount rates that intentionally discriminate against Children.

297.   Economists working for and with Defendants have advised for decades that the discount rate be lowered when government makes decisions affecting climate change. Experts have advised Defendants that the long-term catastrophic dangers posed by climate pollution warrant a much lower discount rate of zero percent or even a negative discount rate, if any.

298.   The economist who invented discounting, Frank Ramsey, advised in 1928 that discounting the welfare of future generations was "ethically indefensible."

299.   EPA itself has acknowledged that its discount rates are insufficient with respect to the rights of future generations, saying that when considering climate benefits for intergenerational harm, discount rates lower than 2% are warranted. Notwithstanding that acknowledgment, it has been using 3% as its baseline for analysis of its preferred programs.

300.   EPA's explicitly discriminatory discount rates used in its regulatory analysis have contributed to EPA's ongoing allowance of unsafe levels of climate pollution for Children.

**COMPLAINT FOR DECLARATORY RELIEF**

301.   If EPA had not applied discount rates to its economic analyses of how much and whether to limit climate pollution, the true costs of climate change on Children, and the true benefits to eliminating fossil fuel climate pollution would have been disclosed.

302.   On information and belief, if EPA had not applied discount rates to its economic analyses of how much and whether to limit climate pollution, and had disclosed and evaluated the true costs of climate change on Children and the true benefits of eliminating fossil fuel climate pollution, there would be less climate pollution today in the United States and the Plaintiffs' injuries would be reduced.

303.   In November 2023, the Biden Administration released new guidance recommending a 2% discount rate be used by March 2024. Even if EPA begins using the 2% rate, it would still intentionally discriminate against Children, devaluing them, in making decisions about whether and how to control climate pollution.

304.   In addition to the discriminatory discount rates EPA uses, EPA also applies an approach to evaluate the costs and benefits of the health risks and harms to Children from climate pollution that discriminates against Children in favor of adults. Defendants systematically place a lesser economic value on reducing climate pollution health risks to Children than on reducing health risks to adults.

305.   EPA also economically devalues the lives of Children by treating them as worth fewer dollars than an adult because of Children's lesser earning potential. The devaluing of Children's lives leads to a discriminatory conclusion that smaller economic benefits accrue from protecting Children.

306.   While the full costs of the climate damages that would result from maintaining a fossil fuel-based economy may be incalculable, there is already ample evidence concerning the enormous extent of those costs. There is no rational calculus that supports any decision not to immediately and swiftly control climate pollution to abate the climate crisis.

**COMPLAINT FOR DECLARATORY RELIEF**

**EPA Has Disregarded the Best Science on
Climate Pollution and Earth's Energy Imbalance**

307.   Based on the best scientific information, $CO_2$ concentrations greater than 350 ppm cause an Earth Energy Imbalance ("EEI"). EEI is increasing and amounted to $0.76 \pm 0.2$ watts per square meter (W/m2) during 2006–2020. That energy imbalance is also measured cumulatively as $381 \pm 61$ zeta joules (ZJ, $10^{21}$ joules) between 1971 and 2020.

308.   Between 2005 and 2019, the EEI doubled, representing an unprecedented and rapid heating of our planet. Earth Energy Imbalance is the physical fact that climate pollution is trapping more heat that Earth normally reflects back out to space and it is heating the oceans, the land surface, and the air. It is like wearing extra layers of sweaters in the summer and not being able to take them off.

309.   Restoring Earth's energy balance is key to abating or alleviating the climate crisis. Scientists say that to restore energy balance, we must swiftly reduce climate pollution by eliminating fossil fuel combustion and protecting and enhancing carbon sinks to sequester already accumulated $CO_2$ in our air. Earth's energy balance will only be restored when atmospheric $CO_2$ is returned to concentrations less than 350 ppm, which will restore a stable climate system.

310.   To illustrate the enormous amount of extra energy that climate pollution traps on Earth, 381 ZJ could power the City of Los Angeles for more than 4.8 million years. The oceans are absorbing most of that extra energy (heat), which is why the surface temperature of the Earth has not heated as quickly, and also why the ocean's ice sheets are melting and the coral reefs are dying.

311.   The current annual mean concentration of atmospheric $CO_2$ is 419 ppm as of 2022, far above scientists' proposed safe planetary boundary of 350 ppm. The climate pollution concentration in our air is already dangerous for Children. It has already caused an energy imbalance and climate destabilization.

**COMPLAINT FOR DECLARATORY RELIEF**

312.   For comparison, the historical scientific record shows the last time $CO_2$ was over 400 ppm, about three million years ago, the global average sea level was at least 20 feet and up to 65 feet higher than today, with best estimate of 55 feet higher than today, and the planet was about 5ºF (~2.8ºC) warmer than the pre-industrial era. No humans lived on Earth at those greenhouse gas concentrations, which were elevated from a time of enhanced volcanic activity on Earth, which naturally increased carbon dioxide emissions. The reason the seas have not yet risen that much today is because it takes time for the ocean's ice sheets to collapse and melt, which they are in the process of doing faster than any scientists predicted.

313.   This graph depicts the correlation between atmospheric carbon dioxide levels, global temperature levels, and global sea level, as well as the unprecedented rise of $CO_2$ caused by human activity in an unprecedented short time span on historic scales.



83

**COMPLAINT FOR DECLARATORY RELIEF**

314.   Importantly, even during prior natural cycles of climatic change, the increase or decrease in greenhouse gases in the air happened much more gradually over thousands to millions of years and there was no human-caused climate pollution increasing to such extremes as they are now, in such a relatively short time frame of less than 200 years, as depicted in the graph above.

315.   There is an established scientific prescription to return to below 350 ppm this century that requires climate pollution reduction consistent with steadily eliminating nearly all fossil fuel burning by 2050. That prescription was developed by one of the United States' top climate scientists, and former head of NASA's Global Institute for Space Studies, with scientists around the world. Similarly, a growing body of science confirms that atmospheric $CO_2$ concentrations below 350 ppm is also a planetary boundary for a safe climate system. The 350 ppm global prescription cannot be achieved without Defendants ceasing their allowance of nearly all U.S. climate pollution from fossil fuel burning by 2050, with steady reductions each year between now and 2050. In addition, natural carbon sinks, located in lands and waters, need to be protected so they can naturally absorb excess carbon in the air and not become sources of climate pollution themselves.

316.   EPA finds that the current changes from accumulated climate pollution, and future projected changes, "endanger the physical survival, health, economic well-being, and quality of life of people living in the United States (U.S.), especially those in the most vulnerable communities." Defendants know that ongoing climate pollution, especially from fossil fuels, is actively causing serious and life-threatening environmental and health impacts, yet they continue their course of conduct in allowing climate pollution and discriminating against Children.

317.   Due to climate pollution, the surface temperature of Earth has heated by 1.1-1.2°C on average (2018-2022 or 2013-2022 average) above pre-industrial temperatures (1880-1920 average). That temperature exceeds the maximum

**COMPLAINT FOR DECLARATORY RELIEF**

temperatures of the Holocene era, the period of climate stability over the last 10,000 years that enabled human civilization to develop.

318.   Politically-set temperature targets of 1.5 to 2°C, which allow the Earth to heat more than it already has, are not in conformance with the accepted best science, are life-threatening for Children, and are not based on peer-reviewed science publications or the opinions of qualified experts.

319.   EPA has no research, scientific evidence, or reports that say a 1.5°C increase in temperatures from the preindustrial era is safe for Children. In fact, the research, scientific evidence, and reports relied upon by EPA state that a 1.5°C increase in temperatures from the preindustrial era is hazardous for Children and future generations.

320.   We are already in the danger zone. Every added ton of climate pollution to the air today exacerbates the harm to Children.

321.   EPA knows that 350 ppm $CO_2$ is the uppermost level of climate pollution that will protect human health and welfare.

322.   This climate pollution crisis is urgent beyond measure, in part because of feedback loops. Feedback loops work like this: More climate pollution in the air means more heat. More heat means less ice. Melting ice means less white reflectivity on Earth and more heat is absorbed by dark water. Melting ice means methane trapped in frozen permafrost can escape. Methane escaping from frozen land means even more dangerous climate pollution. More heat also means more drought and more climate fires. More climate fires mean more climate pollution. And the cycle continues. Climate pollution begets more climate pollution. Sooner than later, if more and more methane is released from frozen tundra due to feedback loops, Children will experience runaway, unstoppable climate change as has happened on other planets. That risk should compel everyone at EPA and all three branches of the U.S. government into using every ounce of law, reason, creativity, compassion, and

**COMPLAINT FOR DECLARATORY RELIEF**

action they can muster to save this Nation for Children and these Plaintiffs. The Nation's courts should be equally concerned for the massive human rights crisis that is already unfolding.

323.   If unabated, continued climate pollution, especially $CO_2$, will initiate dynamic climate change and dangers that spin out of control for Children and future generations as the Earth's Energy Imbalance triggers amplifying feedbacks and the climate system and biological system pass critical tipping points. Such changes would be irreversible on any time scale relevant to Children and future generations, threatening their survival and wellbeing.

324.   With Defendants' status quo systemic control over air and climate pollution, they project that by 2050, when these Plaintiffs might be starting their own families and bringing Children into the world: climate fire activity will double in the West, increasing burned areas by more than 50%; snowpack will be substantially reduced even from today's levels and snowmelt will shift about four weeks earlier, resulting in warmer and shallower rivers and streams; parasites and diseases will increase; the frequency of high ozone pollution events will increase 50%-100%; more fetuses and Children will prematurely die from climate change; and Children's health will decline further. Each of the injuries detailed above will worsen substantially as our Nation bakes.

325.   Just in terms of avoiding localized air pollution harm in California, separate from climate change, if all fossil fuel pollution were phased out by 2050, the state would avoid about 10,200 premature deaths per year. The cleaner air from eliminating fossil-fuel pollution will save California about $134.1 billion per year in 2050 in avoided health costs. The national savings of eliminating fossil fuel and climate pollution are far greater.

326.   Defendants have systematically exerted their influence, dominion, control, custodianship, and sovereignty over the polluted air and fossil fuels, and

**COMPLAINT FOR DECLARATORY RELIEF**

they have not abated the climate pollution or the harm from it.

327.   Defendants can conform their conduct to control climate pollution while still enabling a viable and more economical energy system in the United States. An energy system that does not result in dangerous amounts of climate pollution has been feasible since before Children were born. Defendants' conduct since 1970 has impeded the development of a non-fossil fuel-based energy system in part by making it cheap and permissible to pollute the air, and by subsidizing climate pollution.

328.   Climate pollution and dangerous air quality serve no rational, legitimate, important, or compelling government purpose.

329.   On information and belief, if Defendants' conduct is ruled unconstitutional, Defendants will control the air and climate pollution in a manner that complies with this Court's opinion, the Constitution, and authority delegated to EPA by Congress. Defendants would begin to abate climate pollution based on best available science and in a manner that does not discriminate against Children.

330.   On information and belief, if Defendants' conduct is ruled unconstitutional, Defendants will control the air and climate pollution to avoid deprivations of rights to life and liberty. As one mechanism, Defendants could establish national ambient air quality standards for climate pollutants, which the U.S. Supreme Court has called "the engine that drives" the Clean Air Act. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). EPA has numerous methods to regulate and control climate pollution. EPA has the exclusive delegated authority and mandate to stop permitting climate polluting activities.

331.   On information and belief, if Defendants stop allowing and effectively control U.S. climate pollution, other governments will similarly act to do their sovereign part of protecting the climate system.

**COMPLAINT FOR DECLARATORY RELIEF**

332.   Clean renewable energy is the most affordable and reliable form of energy today even without accounting for the cost of carbon and climate pollution. Plans exist to transition the United States to 100% clean renewable energy in all energy sectors by 2050 at the latest. It is technically and economically feasible to eliminate nearly all fossil fuel climate pollution by 2050. All of the mobile and stationary sources of climate pollution over which EPA has control can be powered without fossil fuels.

333.   Plaintiffs acting alone, other individuals acting alone, and companies acting alone will not control U.S. climate pollution or stop climate change in time to protect Children and future generations. Defendants are essential actors in alleviating this climate crisis for Plaintiffs and all Children.

334.   Children do not ask this Court to dictate or restructure the Nation's overall mix of electricity generation, transportation means, or any other aspect of the Nation's energy system. Children ask the Court to interpret the Constitution for the rights they assert and allege are infringed, and to resolve the controversy that has arisen over EPA's systemic management and control of climate pollution and air quality, and discriminatory economic discounting practices of the same. EPA must control our Nation's pollution to protect human health and the environment, the job it was assigned, or else it is acting outside the scope of its delegated authority. Without this Court's intervention, it will not do so in time to save these Children.

## CLAIMS

## COUNT I: EQUAL PROTECTION VIOLATION—CHILDREN AS *SUI GENERIS*

335.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

**COMPLAINT FOR DECLARATORY RELIEF**

336.    Through incorporation of the Equal Protection Clause of the Fourteenth Amendment, the Fifth Amendment provides that Defendants shall not deny to any person within its jurisdiction the equal protection of the laws, including Plaintiffs.

337.    Equal protection claims involving Children are *sui generis.* Specifically, the Equal Protection Clause prohibits Defendants from imposing significant risks and injury to Children's well-being for matters beyond their control. Under such circumstances, courts do not apply a traditional tier of scrutiny, but rather analyze the extent to which Defendants' conduct burdens Children's ability to live and enjoy their lives by imposing on them a lifetime of hardship.

338.    Defendants have violated the Equal Protection Clause by intentionally allowing climate pollution from sources under its control (including all stationary sources of pollution, all mobile sources of pollution, fuels, locomotives, ocean-going vessels, and aircraft), which imposes significant risks and injury to Children, including each Plaintiff, in a manner that burdens them with lifetimes of hardship for matters beyond their control.

339.    Defendants' control of the air and climate pollution, through the exercise of their policies and practices described herein, burdens Children's lives by imposing a lifetime of harms and hardship on Children, including Plaintiffs, from birth into their adulthood.

340.    The harms and hardships to Children's lives include economic harms, displacement, psychological harms, barriers to family formation, health impacts, educational deprivation, cultural and religious deprivation, and a diminished ability to seek happiness and an open future, all while being deprived of a meaningful vote and voice on the matter most important to their lives—climate crisis. Plaintiffs, as Children, will face an insurmountable burden in securing their rights.

341.    As a result of Defendants' unconstitutional conduct, Plaintiffs are entitled to declaratory relief, and further relief as necessary to enforce the judgment.

89

**COMPLAINT FOR DECLARATORY RELIEF**

## COUNT II: EQUAL PROTECTION VIOLATION—CHILDREN AS A PROTECTED CLASS

342.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

343.   Defendants' systemic control and management of the air and climate pollution violates Plaintiffs' rights secured to them by the Fifth Amendment, which incorporates the Fourteenth Amendment right of Equal Protection.

344.   Under the adult-centric traditional equal protection tiers of scrutiny analysis, Children as a class are a prime example of a "discrete and insular" minority requiring close judicial scrutiny of invidious discrimination because Children have characteristics that are different from adults and are entitled to consideration on their own terms as growing young people. Specifically, Children:

    a.   Are in early phases of human development and physiologically and psychologically vulnerable.

    b.   Have developing lungs, brains, and immune systems that are particularly sensitive to climate harms, and exposure to these harms can subject Children to a lifetime of hardship.

    c.   Are dependent on their caregivers and are politically and economically powerless until at least age 18.

    d.   Have life expectancy many decades beyond living adults. In the case of the average age of federal policymakers today, Children will live approximately 60 years beyond the federal policymakers and bear the consequences of the decisions of those federal policymakers, especially as to the systemic management and control of climate pollution by Defendants at issue in this litigation.

    e.   Have faced a long history of discrimination where they have been continuously subjected to unequal treatment. Like women, Children

90

**COMPLAINT FOR DECLARATORY RELIEF**

were once considered property and many children were treated as indentured servants or were enslaved.

345.   Being a member of the class of Children is thus more than a chronological fact. Plaintiffs, ages 8 to 17 years old, all fall within the protected class of Children.

346.   All human beings, living adults and living Children alike are similarly situated with respect to their need for air, water, and a stable climate system for life. Our ancestors, including the Framers, also depended on air, water, and a stable climate system for life and were thus also similarly situated to living adults and children with respect to their need for air, water, and a stable climate system for life.

347.   Through their exercise of sovereign control over the air and the life-threatening amounts of climate pollution they allow to enter the air, Defendants have denied and continue to deny Children equal protection of the laws.

348.   Defendants intentionally discriminate against Children by discounting the value of their lives and their future when making decisions about climate pollution. Such explicit classification of Children born and unborn generations as less valuable than living adults demonstrates a discriminatory purpose as a matter of law. Defendants' policies and practices overtly and expressly single out Children for disparate treatment from adults in their cost-benefit analyses.

349.   Defendants' systemic control of the air and climate pollution through the exercise of their authority amounts to unconstitutional differential treatment of Children from the treatment of adults. Children already suffer disproportionate harm from Defendants allowance of climate pollution. The unfairness of the treatment of Children and the higher burden of harm they bear than adults results in unjustified inequality and violates any notion of fairness.

350.   Plaintiffs' physical and mental health is being harmed by Defendants' conduct. Defendants' systemic control of the air and climate pollution through the

**COMPLAINT FOR DECLARATORY RELIEF**

exercise of their authority has caused and contributed to Plaintiffs' homes being threatened with heat, fires, smoke, and floods; Plaintiffs' education being regularly and increasingly disrupted; Plaintiffs not being able to go outside daily because it is not safe and curtailing of their recreational and physical activities; Plaintiffs' religious, spiritual, and cultural practices being disrupted; and Plaintiffs facing long-term water and food insecurity.

351.   Defendants have infringed Children's rights of equal protection by subjugating Children's vital interests in air quality and a stable climate system to the special financial interests of adult persons living today, and non-human persons, like fossil fuel companies, in violation of Children's equal protection of the law.

352.   Defendants' conduct is neither necessary to achieve a compelling government interest nor is it substantially related to achieving any important government interest.

353.   Defendants' discriminatory conduct in allowing dangerous levels of climate pollution into the sovereign air space and in discounting the value of Children's lives is not rationally related to any legitimate government interest.

354.   Absent declaratory relief that Defendants' intentional discrimination through discounting and devaluing practices and their control and systemic management of the air and climate pollution have violated Children's rights of Equal Protection, Plaintiffs will continue to be harmed in worsening ways over the course of their young lives, depriving them of equal protection of the law.

355.   As a result of Defendants' unconstitutional conduct, Plaintiffs are entitled to declaratory relief, and further relief as necessary to enforce the judgment.

**COMPLAINT FOR DECLARATORY RELIEF**

## COUNT III: SUBSTANTIVE DUE PROCESS VIOLATION OF RIGHT TO LIFE

356.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

357.   The Due Process Clause of the Fifth Amendment provides that Defendants shall not deprive any person of the fundamental right to life, liberty, or property without due process of law.

358.   The fundamental right to life means more than not being put to death. The fundamental right to life, as the Framers intended, includes the right of current and future generations of living persons to enjoy this terrestrial existence and pursue happiness in living. The right to life includes vitality (health) and a person's lifespan.

359.   The Nation was founded on a balanced atmosphere and a life-sustaining climate system. Children cannot exercise their rights to life without a stable climate system.

360.   Governmental conduct that knowingly results in a significant diminishment in a child's health, safety, and wellbeing with a lifetime of consequences, such as a reduced lifespan and increased exposure to risk of death, is an infringement of the right to life, unless it is necessary to achieve a compelling governmental interest.

361.   Defendants have infringed Plaintiffs' rights to life through their systemic control over and management of sources of climate pollution, and by intentionally allowing levels of climate pollution that have diminished Children's health and safety, exposed them to increased adverse childhood experiences with harmful lifelong consequences, are shortening their average lifespan, increasing their risk of death and additional physical injury, and causing loss of enjoyment of life.

**COMPLAINT FOR DECLARATORY RELIEF**

362.   Defendants' allowance of life-threateningly high levels of climate pollution has already deprived Plaintiffs of essential aspects of life, including their bodily integrity and health, their opportunity to pursue happiness, and risks depriving them of their full lifespan and a livable future.

363.   Defendants' allowance of life-threateningly high levels of climate pollution has deprived Plaintiffs of the liberty to be safely outside and safely inside, and the very sanctity of their homes.

364.   The deprivations that Plaintiffs have suffered and are suffering is in significant part the result of Defendants' long-standing allowance of climate pollution, while intentionally economically discounting the lives of Children.

365.   Any compelling government interest that could be asserted in systemically allowing dangerous amounts of climate pollution from sources under its authority to control is not necessary. A secure, jobs-producing, thriving national energy system can be powered with non-fossil fuel energy at low costs that are more stable than the costs of a fossil fuel-based energy system. There is no necessary and compelling government interest in allowing destabilizing amounts of climate pollution to enter the air, endangering the Earth's life support systems and Children's right to life.

366.   As a result of Defendants' unconstitutional conduct, Plaintiffs are entitled to declaratory relief, and further relief as necessary to enforce the judgment.

## COUNT IV: VIOLATION OF FUNDAMENTAL RIGHT TO LIFE-SUSTAINING CLIMATE SYSTEM

367.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

368.   The Due Process Clause of the Fifth Amendment provides that Defendants shall not deprive any person of the fundamental rights to life, liberty, or

**COMPLAINT FOR DECLARATORY RELIEF**

property without due process of law. The rights to life, liberty, and property also imply the fundamental right to a life-sustaining climate system on which all life depends.

369.   The beneficiaries of the U.S. Constitution included the founding generation as well as "Posterity," meaning all future generations of Americans, including Children.[6] Our Constitution begins with intergenerational fairness and justice as a basis for forming our "more perfect Union." Our Constitution explicitly foreclosed the English rule that children, or remote generations, should be punished for the actions of their parents or ancestors, in order to preserve opportunity for liberty and happiness for each new generation. Art. III, § 3, cl. 2.

370.   The Supreme Court has long recognized unenumerated fundamental substantive due process liberty rights to personal security, bodily integrity, family autonomy, the right to free movement, the right to transmit religion and culture to children, as fundamental rights that both adults and Children hold.

371.   A stable climate system that sustains human life is fundamental to ordered liberty and every single one of Plaintiffs' fundamental rights to life, liberty, and property.

372.   Defendants have infringed Plaintiffs' fundamental rights to a life-sustaining climate system through their systemic control over and management of sources of climate pollution, and by intentionally allowing levels of climate pollution

---

[6] The Fifth and Fourteenth Amendments should be interpreted through the lens of the Posterity Clause in the Preamble of the Constitution, which articulates intergenerational concern: "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves *and our Posterity*, do ordain and establish this Constitution for the United States of America."

**COMPLAINT FOR DECLARATORY RELIEF**

that have diminished Children's health and safety, exposed them to increased adverse childhood experiences with harmful lifelong consequences, and increased their risk of death.

373.   Defendants' allowance of life-threateningly high levels of climate pollution has already deprived Plaintiffs of essential aspects of their fundamental rights to a life-sustaining climate system, and risks depriving them of the opportunity to repair the destabilized climate system that is causing irreversible harm to them and  their home planet.

374.   The deprivations that Plaintiffs have suffered and are suffering to this fundamental right is in significant part the result of Defendants' long-standing allowance of climate pollution, while intentionally economically discounting the lives of Children.

375.   Any compelling government interest that could be asserted in systemically allowing dangerous amounts of climate pollution from sources under its authority to control is not necessary. Defendants know that a secure, jobs-producing, thriving national energy system can be powered with non-fossil fuel energy at low costs that are more stable than the costs of a fossil fuel-based energy system. There is no necessary and compelling government interest in allowing destabilizing amounts of climate pollution to enter the air, endangering the Earth's life support systems and Children's right to a life-sustaining climate system.

376.   As a result of Defendants' unconstitutional conduct, Plaintiffs are entitled to declaratory relief, and further relief as necessary to enforce the judgment.

## COUNT V: VIOLATION OF ARTICLE II TAKE CARE CLAUSE and SEPARATION OF POWER

377.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

**COMPLAINT FOR DECLARATORY RELIEF**

378.   Pursuant to Article I, Congress enacted laws consolidating and delegating federal authority to EPA to manage the protection of the Nation's air and prevent pollution that endangers human health and welfare from entering or accumulating in the air.

379.   Pursuant to Article II, EPA is an agency of the Executive branch with authority delegated from Congress. As such, EPA is required to take care to faithfully execute the law's explicit language and effectuate Congress' intent to protect the sovereign air from pollution that endangers human health and welfare.

380.   EPA must conduct its programs to protect the quality of the air and water for the benefit of human health and welfare, including for present and future generations, pursuant to the authorities under which EPA operates.  EPA can only exercise its authority within the power granted to it by the Clean Air Act or other statutory authority.

381.   Congress did not delegate to EPA authority or power to execute the law in a manner that would degrade the nation's air, harm Children's health, or endanger Children's welfare. Congress could not have intended to delegate such sweeping authority as EPA has assumed to allow for the significant degradation of air quality and thus, the endangerment of the nation's climate system, and harm to Children's lives. By exercising control of the air and systemically managing climate pollution in a manner that endangers human health and welfare and discounts the lives of Children, EPA has acted far in excess of the legal authority granted it by Congress.

382.   Even if Congress wanted to bestow authority to EPA to allow life-threatening levels of climate pollution and harm Children, Congress has not delegated and cannot delegate to EPA the power to infringe any fundamental right to life or liberty or equal protection of the law. EPA must point to "clear congressional authorization" for the power it claims to permit unhealthy levels of

climate pollution, which is highly consequential and beyond what authority Congress could reasonably be understood to have granted to EPA.

383.   The Clean Air Act does not expressly, nor implicitly, authorize Defendants to systematically allow amounts of climate pollution that destabilize the climate system, endangering Children's health and welfare. Congress cannot delegate authority that it does not possess, including engaging in unconstitutional conduct, and has made no clear statement that it intended such delegation in the Clean Air Act or any other statute delegating authority to EPA.

384.   Whether to damage the Nation's climate system and permit dangerous levels of $CO_2$ and other climate pollution is certainly a question with vast economic and political significance, which would have to be expressly stated in any legislation passed by Congress. Congress' constitutional mandate is to enact laws that preserve the perpetuity of the nation based on the sovereignty of the People, including future generations of Children who will one day exercise the political franchise and their own sovereign power.

385.   As a result of Defendants' conduct that exceeds its delegated authority, Plaintiffs are being injured with no other remedy at law.

386.   As a result of EPA's conduct that exceeds its authority as delegated by Congress under Article I, and does not faithfully execute the law under Article II, Plaintiffs are entitled to declaratory relief and further relief to enforce the judgment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, and each of them, pray for relief as set forth below:

1. For a declaration that Defendants' conduct burdens Children's, including Plaintiffs', ability to live and enjoy their lives by imposing on them significant risk of harm and a lifetime of hardship for matters beyond their

**COMPLAINT FOR DECLARATORY RELIEF**

control, thereby depriving Children of their rights to equal protection of the law;

2. For a declaration that Children are a protected class under the Equal Protection Clause, as incorporated into the Fifth Amendment of the U.S. Constitution through the Fourteenth Amendment;

3. For a declaration that Defendants have violated Children's, including Plaintiffs', rights of equal protection of the law under the Fifth Amendment of the U.S. Constitution by unlawfully discriminating against them in allowing unsafe levels of climate pollution to accumulate in the nation's air;

4. For a declaration that Defendants have violated Children's, including Plaintiffs', rights of equal protection of the law under the Fifth Amendment of the U.S. Constitution by applying discriminatory discount rates and other means of devaluing Children's lives in cost-benefit analyses of Defendants' decisions on controlling climate pollution;

5. For a declaration that EPA, by intentionally allowing life-threatening levels of climate pollution to enter and accumulate in the air, has significantly diminished Children's, including Plaintiffs', health, safety, and wellbeing with a lifetime of consequences, such as a reduced lifespan and increased exposure to risk of death, thereby depriving them of their fundamental rights to life.

6. For a declaration that the fundamental right to a life-sustaining climate system is encompassed within the Fifth Amendment substantive due process fundamental right to life and is also inseparable from fundamental rights to liberty and property.

**COMPLAINT FOR DECLARATORY RELIEF**

7. For a declaration that EPA has exceeded its delegated authority by allowing unsafe levels of climate pollution that endanger Children, including Plaintiffs, to enter and accumulate in the nation's air.

8. Pursuant to 28 U.S.C. § 2202 and this Court's Article III authority, grant such other and further relief as the Court deems just and proper to redress the constitutional violations so declared and adjudged; and

9. Award Plaintiffs their costs and reasonable attorneys' fees in this action.

Respectfully submitted this 10th day of December, 2023, on the 75th anniversary of the Universal Declaration of Human Rights,

*s/ Julia A. Olson*
JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (applicant *pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (applicant *pro hac vice*)
csmith@law.du.edu
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

**COMPLAINT FOR DECLARATORY RELIEF**

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT
IRVINE, SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

*Attorneys for Plaintiffs*

101
**COMPLAINT FOR DECLARATORY RELIEF**