**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| G.B., a minor, by and through her Guardian, G.P.; M.W., a minor, by and through her Guardian R.W.; M.A., a minor, by and through her Guardian M.T.; Z.M., a minor, by and through his Guardian S.W.; M.M., a minor, by and through his Guardian S.W.; D.R., a minor, by and through her Guardian A.P.; M.R., a minor, by and through their Guardian M.R.; M.D., a minor, by and through her Guardian S.A.; N.C., a minor, by and through their Guardian N.M.; I.W., a minor, by and through her Guardian C.W.; A.S., a minor, by and through his Guardian P.S.; A.L., a minor, by and through her Guardian E.L.; H.A., a minor, by and through his Guardian R.A.; N.R., a minor, by and through their Guardian S.R.; E.W., a minor, by and through her Guardian S.W.; A.J., a minor, by and through their Guardian A.J.; L.H., a minor, by and through her Guardian R.H.; D.S., a minor, by and through his Guardian R.K., <br><br> *Plaintiffs-Appellants*, <br><br> v. | No. 25-2473 <br><br> D.C. No. 2:23-cv-10345-MWF-AGR <br><br><br> OPINION |

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; UNITED
STATES OF AMERICA; LEE ZELDIN,
in his official capacity as Administrator
of the Environmental Protection Agency;
UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official
capacity as Director of the Office of
Management and Budget,

                    *Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of California
Hon. Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted March 5, 2026
San Francisco, California

Filed April 9, 2026

Before: RONALD M. GOULD, MILAN D. SMITH, JR.,
and RYAN D. NELSON, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Environmental Law

The panel affirmed the district court's judgment dismissing an action brought by eighteen minors against the U.S. Environmental Protection Agency (EPA) and other federal entities and officials (collectively, the Government) challenging the policy and practice of promulgating rules regulating greenhouse gas (GHG) emissions in reliance on cost-benefit analyses that "discount" the value of future costs and benefits.

Plaintiffs alleged that the EPA's use of discounting discriminates against children like them in violation of their constitutional rights because it favors present-day consumption over future consumption, thereby advantaging adults at the expense of minors. They further alleged that GHG regulations predicated on discounted future costs and benefits harm the environment because they allow greater GHG emissions, ultimately harming Plaintiffs.

The panel agreed with the district court that Plaintiffs lacked standing to maintain their suit. Plaintiffs' discrimination theory failed to state a viable injury-in-fact to their equal protection rights. Plaintiffs' alleged environmental harms were not fairly traceable to the Government's discounting policies. Plaintiffs' request for a declaration that the Government's discounting policies violated their rights under the Fifth Amendment was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

foreclosed by circuit precedent because declaratory relief was unlikely to remedy Plaintiffs' asserted injuries.

Finally, the panel held that the district court did not abuse its discretion by denying Plaintiffs further leave to amend their complaint because further amendment would be futile.

## COUNSEL

Brianna R. Kabwika (argued), Julia A. Olson, Catherine E. Smith, and Andrea K. Rodgers, Our Children's Trust, Eugene, Oregon; Philip L. Gregory, Gregory Law Group, Redwood City, California; Paul L. Hoffman, Civil Rights Litigation Clinic, University of California at Irvine School of Law, Irvine, California; John C. Washington, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Hermosa Beach, California; for Plaintiffs-Appellants.

Christopher Anderson (argued), Sean C. Duffy, and Daniel Halainen, Attorneys, Environment & Natural Resources Division; Robert N. Stander, Deputy Assistant Attorney General; Adam R.F. Gustafson, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; Daniel H. Conrad, Associate Deputy General Counsel, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C.; for Defendants-Appellees.

Douglas A. Ruley and Abigail L. Fleming, Environmental Justice Clinic; Bernard P. Perlmutter, Children and Youth Law Clinic; University of Miami School of Law, Coral Gables, Florida; for Amici Curiae Children's Rights Advocates.

Daniel P. Mensher and Alison S. Gaffney, Keller Rohrback
LLP, Seattle, Washington, for Amici Curiae Medical
Professionals and Health Advocacy Organizations.

Matthew I. Summers, Berger Montague PC, San Francisco,
California, for Amici Curiae Economists and Economics
Scholars.

**OPINION**

M. SMITH, Circuit Judge:

Plaintiffs-Appellants are eighteen minors who sue the
U.S. Environmental Protection Agency (EPA) and other
federal entities and officials (collectively, the Government)
to challenge an economic tool that the EPA sometimes
consults in its rulemaking process. Plaintiffs allege that the
Government has a policy and practice of promulgating rules
regulating greenhouse gas (GHG) emissions in reliance on
cost-benefit analyses that "discount" the value of future costs
and benefits. Discounting allows agencies like the EPA to
translate the future value of money into present-day value,
so they can compute the projected effects of a proposed
regulation over time. Rooted in the "time value of money,"
discounting seeks to account for the economic observation
that a dollar today is generally more valuable than a dollar
tomorrow.

According to Plaintiffs, the EPA's use of discounting
discriminates against children like them in violation of their
constitutional rights because it favors present-day
consumption over future consumption, which, Plaintiffs say,
advantages adults at the expense of minors. Plaintiffs further

allege that GHG regulations predicated on discounted future costs and benefits harm the environment because they allow greater GHG emissions (when compared against hypothetical regulations lacking this predicate), which in turn leads to increased atmospheric temperatures and extreme weather events, ultimately causing Plaintiffs to suffer a litany of downstream harms, such as damage to their homes, respiratory ailments, and anxiety over climate change.

The district court held that Plaintiffs lacked standing to pursue these claims. Rather than satisfying the familiar requirements of injury, causation, and redressability, the district court determined that Plaintiffs' lawsuit stumbled on all three. In particular, the court concluded that Plaintiffs' discrimination theory did not assert a cognizable injury-in-fact; that Plaintiffs' alleged environmental injuries are not fairly traceable to the Government's use of discounting; and that Plaintiffs' request for declaratory relief is unlikely to redress their asserted harms. Because of these deficiencies, the district court declined to grant Plaintiffs a third opportunity to plead their claims. We agree with the district court and now affirm.

## BACKGROUND

### I.  Regulatory Background

Since the early 1980s, presidential administrations from both parties have required federal agencies to analyze costs and benefits before undertaking certain regulatory actions. *See* Caroline Cecot & W. Kip Viscusi, *Judicial Review of Agency Benefit-Cost Analysis*, 22 GEORGE MASON L. REV. 575, 575 (2015) (citing Exec. Order No. 12,291, 46 Fed. Reg. 13193, 13193 (Feb. 17, 1981)). President Bill Clinton modernized this requirement in 1993 when he issued

Executive Order 12866 (E.O. 12866).    *See generally*
Regulatory Planning and Review, Exec. Order No. 12,866,
58 Fed. Reg. 51735 (Sept. 30, 1993).

E.O. 12866 provides that agencies should ordinarily
"propose or adopt a regulation only upon a reasoned
determination that the benefits of the intended regulation
justify its costs."    *Id.* § 1(b)(6).    The rule applies when an
agency contemplates a "significant" regulatory action, such
as a rule with "an annual effect on the economy of $100
million or more."    *Id.* § 3(f)(1).    E.O. 12866 does not,
however, require that any proposed agency action produce a
net financial return.    It requires only that the applicable
action's "benefits"—defined to include promoting an
efficient economy, enhancing health and safety, protecting
the environment, and eliminating discrimination—"justify
its costs."    *Id.* §§ 1(b)(6), 6(a)(3)(C)(i).

In accordance with E.O. 12866, federal agencies
typically issue "regulatory impact analyses" (RIAs) setting
forth their cost-benefit analyses on proposed regulations.
*See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 759 (2015);
*Massachusetts v. HHS*, 923 F.3d 209, 216 (1st Cir. 2019).
According to Plaintiffs, RIAs "are the 'formal way' [the]
EPA anticipates and evaluates the likely consequences of its
regulatory actions," including those seeking to regulate
"climate pollution."

In 2003, the Office of Management and Budget (OMB)
issued a memorandum entitled "Circular A-4" to help guide
federal agencies on conducting regulatory analyses pursuant
to E.O. 12866.    Among other things, Circular A-4 directs
agencies to "monetize" costs and benefits through "sound
and defensible" procedures "whenever possible."    And since
"[b]enefits and costs do not always take place in the same

period," and often accrue well into the future, agencies generally should adjust their quantitative estimates to account for "difference[s] in timing" by discounting future costs and benefits to present value.  This technique is rooted in the "time value of money," *Atl. Mut. Ins. v. Comm'r*, 523 U.S. 382, 384 (1998), often described as the assumption that a dollar today is generally more valuable than a dollar tomorrow.

Consistent with this principle, Circular A-4 articulates three rationales for applying discount rates when conducting cost-benefit analyses: (1) resources invested generally produce a positive return; (2) the principle of diminishing marginal utility provides that as consumption increases, the value of consumption tends to decrease; and (3) there is a cost to delaying benefits because "people generally prefer present to future consumption."  According to a Circular A-4 "Appendix" that went into effect in 2023, the OMB generally recommends a 2% discount rate on applicable future costs and benefits through the year 2079.[1]

But Circular A-4 also acknowledges that not all benefits and costs can be expressed "in monetary units."  Agencies therefore "should exercise professional judgment in determining how important the non-quantified benefits or costs may be in the context of the overall analysis."  A "good regulatory analysis," moreover, cannot be conducted "according to a formula" but instead requires "competent professional judgment."  "Different regulations may call for different emphases in the analysis, depending on the nature

---

[1] We regard both Circular A-4 and the cited Appendix as incorporated into Plaintiffs' First Amended Complaint (FAC) by reference.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

and complexity of the regulatory issues and the sensitivity of the benefit and cost estimates to the key assumptions."

The EPA's Guidelines for Preparing Economic Analyses (Guidelines) offer further guidance on preparing RIAs in support of EPA's regulatory actions.[2]  Like Circular A-4, the Guidelines seek to provide analysts with "sound science" and "best practices for economic analysis grounded in the economics literature."   On discounting, the Guidelines acknowledge that selecting an appropriate discount rate can be "a challenge," especially when analyzing the effects of environmental policy.  Because such policies tend to have long time horizons and can involve costs and benefits spread across generations, economic forecasts have greater uncertainty and policies affect "future generations without a voice in the current policy process."  Moreover, "the normative choice of how a decision maker should weigh the welfare of present and future generations . . . cannot be made on economic grounds alone."

The Guidelines acknowledge that, in light of these factors, there is growing empirical support for "discount rates that decline over time."  And, as a result, the Guidelines recommend that analysts consider applying certain prescribed declining rates and offer a host of principles for analysts to consider when doing so.  Also like Circular A-4, the Guidelines repeatedly stress the importance of "professional judgment" in conducting regulatory analyses.  And they explain that such analyses are not susceptible to a

---

[2] Although Plaintiffs' FAC challenges the 2016 version of the Guidelines, the 2024 version has since supplanted it.  We take judicial notice of that fact and the document's contents.  *See* Fed. R. Evid. 201(b); *Campbell v. Pricewaterhouse Coopers, LLP*, 642 F.3d 820, 824 n.3 (9th Cir. 2011) (taking judicial notice of various agency materials).

"rigid blueprint," as the ideal approach will ultimately "depend on case-specific factors."

In 2021, President Joseph Biden signed Executive Order 13990 (E.O. 13990), directing federal agencies like the EPA to "capture the full costs of greenhouse gas emissions" in order to facilitate "sound decision-making" on climate issues. Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Exec. Order 13990, 86 Fed. Reg. 7037, 7040 (Jan. 20, 2021). The order established an "Interagency Working Group" on the social costs of GHGs and directed the group to provide recommendations "to ensure" the costs of GHG emissions "are based on the best available economics and science." *Id.*

Exactly four years later, President Donald Trump withdrew E.O. 13990, disbanded the interagency group, reaffirmed that regulatory analyses should comport with Circular A-4, and directed the EPA to issue new guidance on calculating the costs of GHG emissions. Unleashing American Energy, Exec. Order 14154, 90 Fed. Reg. 8353, 8356–57 (Jan. 20, 2025). OMB fulfilled that directive a few months later by issuing guidance directing the EPA to limit its consideration of GHG emissions to "the minimum" amount necessary to satisfy statutory requirements. OFF. MGMT. & BUDGET, EXEC. OFF. OF PRESIDENT, GUIDANCE IMPLEMENTING SECTION 6 OF EXEC. ORDER 14154 (OMB Guidance) at 1–2 (2025).[3] OMB added that agencies "should not monetize the impacts" of GHG emissions, unless required by law, "because the uncertainties in

---

[3] We take judicial notice of this document's contents, too. *See* Fed. R. Evid. 201(b); *Campbell*, 642 F.3d at 824 n.3.

performing monetized impacts quantifications are too great." *Id.* at 3.

## II. Factual Background

Plaintiffs are eighteen minors residing in California, some of whom appear to have reached the age of majority. They assert various injuries that they attribute to climate change, including lost and damaged homes due to wildfires and increased rainfall, headaches and fatigue due to rising temperatures, and respiratory injuries due to fossil fuel emissions and wildfire smoke. Several allege that climate change causes them anxiety and related conditions. Some complain of "school cancellations" due to "lost power on especially hot days" and extreme weather events. And a few allege disruption to their religious practices.

The First Amended Complaint (FAC) contends that this "climate crisis" is "government-imposed and -sanctioned." It asserts that the Government maintains "systematic control and management of climate pollution, through [its] Discounting Policies" and its practice of applying these policies, which Plaintiffs say "contributed to" their injuries. The "Discounting Policies" that Plaintiffs target are Circular A-4 and the Guidelines, which they contend are "explicitly discriminatory" against children. Their theory is that the Discounting Policies "build into [the Government's] decision-making processes a requirement that [the Government] value the present more than the future when evaluating the social or health impacts of regulatory programs regarding how much climate pollution to allow." By doing so, the theory goes, the Government underregulates climate pollution to the detriment of children. Or, as Plaintiffs put it, "the Discounting Policies put a thumb on the scale against reducing climate pollution for [c]hildren,

thereby favoring other groups who benefit economically in the short term from maintaining climate pollution activities."

## III.  Procedural Background

Plaintiffs filed this suit in 2023, seeking a declaration that the Government violated their constitutional rights by "allowing unsafe levels of climate pollution."  In its motion to dismiss, the Government asserted that Plaintiffs lacked Article III standing to maintain their suit.  The district court agreed.  It determined that circuit precedent foreclosed the sole declaratory-relief remedy sought and compelled the conclusion that such relief was unlikely to redress Plaintiffs' alleged injuries.  Despite the district court's skepticism that Plaintiffs could adequately amend their complaint, the court granted them "one more chance" to address the standing defects but cautioned that "[a]ny future successful motion to dismiss will be granted without leave to amend."

Plaintiffs amended their complaint in 2024, centering their case on the Government's use of discounting while continuing to allege that the effects of climate change cause Plaintiffs an assortment of harms.  They grounded their theories largely on the Fifth Amendment.[4]  In addition to

---

[4] Plaintiffs also purport to assert a claim under Article II's Take Care Clause but we have no occasion to address it because Plaintiffs offer no argument or authority establishing that the Take Care Clause confers a private remedy.  This is important as "[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement," *DeVillier v. Texas*, 601 U.S. 285, 291 (2024), and the viability of a private Take Care claim remains an "open question," *Las Ams. Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021)—a "difficult" one at that, *Citizens for Resp. & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 138 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019).  Plaintiffs have not done enough to raise the question for our resolution.  The most they could muster is a

seeking a declaration that the Discounting Policies discriminate against children and violate their purported "fundamental right to a life-sustaining climate system," the FAC added a request for injunctive relief barring the Government from applying a positive discount rate when analyzing "the future . . . costs of emitting climate pollution" or "the future . . . benefits of reducing climate pollution."

Again, the Government moved to dismiss. It asserted, among other things, that Plaintiffs still could not satisfy Article III's standing requirements. The district court agreed, but its rationale differed from its previous order. This time, the district court held that Plaintiffs failed to plead facts showing that the Discounting Policies are discriminatory in nature and that their asserted environmental harms are traceable to the Discounting Policies. On these grounds, the district court dismissed Plaintiffs' FAC. Consistent with its prior warning, the court refused to grant Plaintiffs further leave to amend their complaint.

Plaintiffs then timely appealed. *See* Fed. R. App. 4(a)(1)(B).

### JURISDICTION & STANDARD OF REVIEW

We have appellate jurisdiction to review the district court's dismissal order under 28 U.S.C. § 1291. Because the district court dismissed the case for lack of subject matter jurisdiction, we review the order de novo. *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

---

statement in their reply brief that "[n]o binding precedent" bars the claim, along with citations to two off-point district court decisions. We decline to "manufacture arguments" in Plaintiffs' favor. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

In doing so, we assume the truth of well-pleaded facts, construing them "in the light most favorable to the plaintiffs." *Id.* And we "draw all reasonable inferences" in Plaintiffs' favor. *Jewel v. NSA*, 673 F.3d 902, 907 (9th Cir. 2011). We do not, however, assume the truth of legal conclusions couched as factual allegations. *Warren*, 328 F.3d at 1139. Nor do we "accept as true" allegations "contradicted by documents referred to in the complaint." *Id.* (internal quotations omitted). We review a district court's decision not to grant leave to amend a complaint for "abuse of discretion." *Wood v. City of San Diego*, 678 F.3d 1075, 1080 (9th Cir. 2012).

## ANALYSIS

Article III restricts federal courts' jurisdiction to the resolution of "Cases" and Controversies." U.S. CONST. art. III, § 2. This limitation seeks to ensure the judiciary "respects the proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotations omitted). Federal standing is one of several doctrines enforcing the case-or-controversy restriction. *Id.* at 341–42. The "irreducible constitutional minimum of standing" requires a plaintiff to show (1) an "injury in fact," (2) a "causal connection" between that injury and the challenged conduct, and (3) a likelihood that a favorable decision will redress the plaintiff's injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

In an effort to carry their standing burden, Plaintiffs allege that the Government's Discounting Policies discriminate against children like Plaintiffs and cause them downstream "mental, physical, and economic injuries" related to the "climate crisis." To remedy these alleged

injuries, Plaintiffs seek injunctive and declaratory relief. Between two dismissal orders, the district court held (1) that Plaintiffs' discrimination theory failed to assert an injury-in-fact, (2) that Plaintiffs' alleged environmental harms are not fairly traceable to the Discounting Policies, (3) that Plaintiffs' request for declaratory relief is not likely to redress their asserted injuries, and (4) that granting Plaintiffs further leave to amend their complaint would be futile.   We agree on all four points.

## I.   Plaintiffs' discrimination theory fails to state an injury-in-fact.

Plaintiffs do not allege a viable injury to their equal protection rights.[5]  To establish an injury-in-fact, a plaintiff must show that it suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotations omitted).  This requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), and "screens out" those who have only "a general

---

[5] Plaintiffs bring this suit against the federal government under the Fifth Amendment, which, unlike the Fourteenth Amendment, has no express Equal Protection Clause.  The Supreme Court has made clear, however, that the Fifth Amendment's Due Process Clause "contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  Our approach to Fifth Amendment equal protection claims is thus "precisely the same" as our approach "to equal protection claims under the Fourteenth Amendment," *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023), and precedents decided under the latter are controlling when analyzing claims under the former, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).

legal, moral, ideological, or policy objection to a particular government action," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Differential treatment in violation of the Constitution's guarantee of equal protection is a classic injury-in-fact. *Heckler v. Mathews*, 465 U.S. 728, 739–40 & n.7 (1984) (collecting cases). "[B]y perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community," discrimination inflicts "serious" injuries on persons denied equal treatment. *Id.* at 739–40 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)).

The denial of equal protection is actionable where the government acts with "discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). "'Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences." *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). "It implies that the decisionmaker selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (alteration in original). An allegation that "official action, neutral on its face," has a disproportionate effect on a protected class "is insufficient." *De La Cruz v. Tormey*, 582 F.2d 45, 58 (9th Cir. 1978); *accord, e.g.*, *Carrillo-Lopez*, 68 F.4th at 1140–41; *Crawford v. Bd. of Educ.*, 458 U.S. 527, 537–38 (1982).

To be sure, evidence of a disproportionate impact might bear on the question of discriminatory purpose. *Vill. of*

*Arlington Heights.*, 429 U.S. at 265. And although a plaintiff need not show that discrimination was the sole reason behind the challenged action, the plaintiff must establish that discrimination "was a 'motivating factor.'" *Mi Familia Vota v. Fontes*, 129 F.4th 691, 724 (9th Cir. 2025) (quoting *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015)). This inquiry tends to be factually intensive; but nothing prevents a court from resolving it on the pleadings where the plaintiff alleges facts reflecting no more than a disproportionate impact on a classified group. *See De La Cruz*, 582 F.2d at 58–59.

This limitation disposes of Plaintiffs' discrimination theory. Plaintiffs allege that the Government's Discounting Policies, and its alleged practice of applying them when analyzing the future impacts of GHG regulations, violate their equal protection rights. They argue that the Government's decision to discount those future impacts is based in part on a preference for current consumption over future consumption, such that future benefits of climate regulations are regarded as less valuable than current benefits. This preference in turn results in "less ambitious" GHG regulations, which permit greater amounts of future climate pollution than would regulations setting GHG emission goals without discounted future benefits. As Plaintiffs see it, the Discounting Policies "put a thumb on the scale against reducing climate pollution tomorrow and in the years ahead," to the ultimate detriment of children such as Plaintiffs.

This theory does not amount to an invasion of Plaintiffs' equal protection rights. The record supplies no basis to infer that the Discounting Policies recommend positive discount rates "because of" their allegedly "adverse effects" on children, *Lee*, 250 F.3d at 687, nor that discriminating against children served as a "motivating factor," *Mi Familia*

*Vota*, 129 F.4th at 724.  The Discounting Policies themselves articulate the Government's intentions in recommending positive discount rates: applying "sound and defensible" procedures "grounded in the economics literature."  To that end, Circular A-4 articulates three economic rationales for discounting future costs and benefits to present value: (1) that a dollar invested today is generally worth more tomorrow; (2) that as consumption increases, the value of consumption tends to decrease; and (3) that "people generally prefer present to future consumption."  Plaintiffs pay no mind to the first or second rationales but argue that the third is a proxy for discrimination against children.  Preferring consumption today over consumption tomorrow, they aver, marks an intentional effort to favor adults at the expense of children.

We disagree.  As the Government notes, children are present-day consumers just like adults.  Persons under 18 years old wield significant economic power—both directly and, by influencing adults' decisions, indirectly.[6]  They hold jobs.  *See generally* 29 C.F.R. § 570.33.  They eat at restaurants.  *See Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 510 (2d Cir. 2005).  They consume online content and "increasingly have smartphones and tablets."  *Jones v. Google LLC*, 73 F.4th 636, 639 (9th Cir. 2023).  They buy books, magazines, and other print media.  *See Ginsberg v. New York*, 390 U.S. 629, 636 (1968).  They

---

[6] According to the American Academy of Pediatrics, "[a]dvertising to children and teenagers is a multibillion-dollar industry," with expenditures in the United States exceeding $3 billion in 2018 alone. Jenny Radesky et al., *Digital Advertising to Children*, 146 PEDIATRICS 1, 1 (2020).

purchase and rent video games.  *See Brown v. Env't Merchs. Ass'n*, 564 U.S. 786, 804 (2011).  The list goes on.

There are, of course, differences between adults' and children's consumption.  The law generally treats minors as more vulnerable consumers.  *See, e.g.*, *Ginsberg*, 390 U.S. at 636.   State laws tend to restrict minors' capacity to contract.  *See, e.g.*, Cal. Fam. Code § 6701.  And adults tend to have far greater purchasing power than children.  None of that, however, adds up to an inference that "children are not consumers," as Plaintiffs proclaim.  In our view, the opposite proposition is beyond genuine dispute.  *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) (courts can consider "commonsense economic realities" when analyzing standing).

So, to the extent the Discounting Policies reflect a preference for present-day consumption over future consumption, they favor present-day consumption by children as well as adults.  Stated otherwise, the Discounting Policies' tendency to favor present-day consumption works to the present advantage of all present persons—children and adults alike.  And, conversely, the Discounting Policies' tendency to disfavor future consumption works to the future disadvantage of all future persons—children and adults alike.   The Discounting Policies do not intentionally discriminate against persons under 18 years old, and Plaintiffs have pleaded no "invasion of a legally protected interest."   *Spokeo*, 578 U.S. at 339 (internal quotations omitted).

The gravamen of Plaintiffs' theory seems to be that because children today will on average live longer than adults today, children will on average endure more of the alleged harm inflicted by the Discounting Policies over time.

Indeed, that is the gist of the declaration submitted by Plaintiffs' economic expert, Dr. Joseph Stiglitz, who asserts that the Discounting Policies "have a disproportionate effect on children and future generations."[7]  Perhaps.  But without more, that is not a cognizable theory of discrimination under the Constitution.  *See, e.g.*, *De La Cruz*, 582 F.2d at 5; *Crawford*, 458 U.S. at 537–38.  "The mere fact" that the Government's "facially neutral" Discounting Policies have a "disproportionate impact" on children "does not mean that they violate[] the Equal Protection Clause."  *Lee*, 250 F.3d at 687.

Though Plaintiffs insist the Discounting Policies "facially and intentionally discriminate against children," they offer no support for these labels.  They are mere "legal conclusions" couched as facts, which we need not "accept as true," especially as they are "contradicted by" the Discounting Policies themselves.  *Warren*, 328 F.3d at 1139 (internal quotations omitted).  Nothing in Circular A-4 or the Guidelines facially discriminates against children, as neither so much as mentions children in their discussions of discounting.[8]  On the contrary, in explaining the preference

---

[7] At times, Plaintiffs and their experts seem to conflate "future generations" with "children."  They cite no authority, however, for the proposition that these classes should be grouped together for equal protection purposes, and we have found none.  But because we do not reach the merits of Plaintiffs' equal protection arguments, we need not determine whether, or how, conflating the two impacts the equal protection analysis.

[8] Not a problem, Plaintiffs say, for the Supreme Court in *Guinn v. United States*, 238 U.S. 347, 364–65 (1915), found an equal protection violation based on a law that contained "no express words" of exclusion.  *Guinn* is no help to Plaintiffs.  The Court in *Guinn* invalidated a thinly veiled racial classification in Oklahoma's constitution, which used the date on which a person (or their "lineal descendant") acquired the right to vote

for present-day consumption, Circular A-4 states that
"*people* generally prefer present to future consumption"—
encompassing children no less than adults.

The closest either document comes to supporting
Plaintiffs' theory is the Guidelines' acknowledgment that,
when analyzing agency action with a lengthy time horizon,
analysts should consider applying declining discount rates,
partially because such policies affect "future generations"
with no voice in the policymaking process.  However, a
general recognition that policies might affect "future
generations"—such that policymakers should take
precautions to mitigate the effects—is not enough to show
discriminatory intent.  Putting aside the question whether
"future generations" qualify as children at all (*supra* note 7),
knowledge that a policy might have an incidental, disparate
effect on a classified group, without more, is not evidence of
an intent to discriminate.  *Lee*, 250 F.3d at 687.  Plaintiffs'
burden was to plead facts supporting an inference that
discriminating against children was a factor "motivating" the
Government's Discounting Policies or its practice of
applying them.  *Mi Familia Vota*, 129 F.4th at 724.  They
have not shouldered that burden.

Nor have Plaintiffs shown, as they argue on appeal, that
the district court "impermissibly" resolved fact disputes in
the Government's favor by concluding "that the Discounting
Policies and Practices do not disfavor children over adults,"
despite the FAC's assertions to the contrary.  The district
court resolved no genuine fact disputes in drawing that
conclusion.  It held only that, assuming the truth of
Plaintiffs' well-pled allegations and looking to the

---

as a proxy for race.  *Id.*  The Discounting Policies, in contrast, do not
classify children at all, by proxy or otherwise.

Discounting Policies that Plaintiffs target, Plaintiffs have not shown these policies to be "discriminatory in nature." The court was well within its authority to reach that conclusion. The question whether a plaintiff's allegations of harm assert an Article III injury is a *legal* determination—not a factual one. *See Allen v. Wright*, 468 U.S. 737, 755–56 (1984) (holding that plaintiffs lacked standing to sue because they failed to plead sufficient facts sustaining their discrimination theory), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *cf. Lee*, 250 F.3d at 687 (rejecting equal protection claim as a matter of law based on "facially neutral" policies that had at most a "disproportionate impact on an identifiable group"). In our view, the district court answered that question correctly when it determined that Plaintiffs' discrimination theory failed to assert a cognizable injury-in-fact.

## II. Plaintiffs' alleged environmental harms are not fairly traceable to the Discounting Policies.

Beyond challenging the Discounting Policies as discriminatory, Plaintiffs assert that these policies result in insufficient regulation of GHGs. According to Plaintiffs, this under-regulation contributes to climate change, spawning wildfires, heatwaves, and other extreme weather incidents, which inflict damage on Plaintiffs' homes, aggravate their respiratory conditions, disrupt their schools and religious practices, and so on. For purposes of this appeal, the Government concedes "that at least one Plaintiff has pleaded cognizable injuries attributable to climate change." Assuming without deciding that the Government is correct, we proceed to the standing inquiry's second step: causation.

This prong requires a plaintiff to show that its asserted injury is "fairly traceable" to the defendant's misconduct. *Allen*, 468 U.S. at 751.   Although a plaintiff need not establish that the challenged conduct is "the sole source" of their injury, *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011), their causal chain cannot rest on "speculative links" or be "too attenuated," *All. for Hippocratic Med.*, 602 U.S. at 383; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (standing cannot depend on a "speculative chain of possibilities" (citation omitted)).   The traceability inquiry is not "mechanical" and it, too, can be "heavily fact-dependent."   *All. for Hippocratic Med.*, 602 U.S. at 384 (internal quotations omitted).

Because Plaintiffs seek injunctive relief, their burden is to show an "actual and imminent" threat of future harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (allegations that plaintiff was illegally choked by police did not establish real and immediate threat that he would be choked again).[9]

The district court correctly determined that Plaintiffs' alleged environmental harms are not fairly traceable to the Discounting Policies.   In our view, Plaintiffs' theory of causation is too speculative and tenuous to invoke this Court's subject matter jurisdiction.   *All. for Hippocratic Med.*, 602 U.S. at 383.   To connect Plaintiffs' alleged future

---

[9] Although Plaintiffs also seek declaratory relief, we explain in the section below that circuit precedent forecloses that remedy as a matter of law.   And Plaintiffs "must have standing to seek each form of relief requested in the complaint."   *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 434 (2017).

environmental harms to the Government's Discounting Policies, one must assume the following:

(1)   that the EPA will consider promulgating a rule regulating GHG emissions;

(2)   that, when analyzing the rule's costs and benefits, the EPA will apply a positive discount rate to future costs and benefits;

(3)   that the EPA will promulgate the rule in reliance on the RIA's discounted future costs and benefits;

(4)   that the rule will under-regulate GHG emissions vis-à-vis a hypothetical rule premised on an RIA that did not discount future costs and benefits;

(5)   that the excess GHG emissions will increase the temperature of Earth's climate, cause extreme weather events, and so on; and

(6)   that the resulting calamities will exacerbate Plaintiffs' economic, physical, and other harms.

Each of the first three links requires speculation. Starting at the top, Plaintiffs do not challenge any proposed rule regulating GHG emissions, so they can only guess that the current administration or future administrations will promulgate such a rule. Yet "courts cannot presume . . . to predict" how "governing officials" might exercise their discretion. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614–15 (1989); *see also Clapper*, 568 U.S. at 410–11 (refusing to speculate about the source of authority the government

might invoke when conducting future surveillance). Indeed, Article III's ripeness doctrine prevents this sort of guesswork. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (ripeness seeks to "protect [] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties") (internal quotations omitted).

We acknowledge Plaintiffs' allegations of past efforts by the Government to regulate GHG emissions. And we likewise acknowledge that allegations of past conduct can sometimes support an inference of future injury. *See Lyons*, 461 U.S. at 102. But that is not always the case, *id.* at 105, and such an inference would not be "reasonable" under the circumstances, *Jewel*, 673 F.3d at 907. Plaintiffs identify no effort by the current administration to regulate GHG emissions, which is significant because the administration's current guidance directs the EPA to limit its consideration of such emissions to "the minimum" amount necessary to satisfy statutory requirements (an exception Plaintiffs have not invoked).[10] OMB Guidance at 1–2. While a future

---

[10] Plaintiffs assert that the EPA recently "discounted the monetized savings and costs" of the "EPA's proposal to rescind the Endangerment Finding for GHGs." *See* Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36288, 36326 (Aug. 1, 2025). But this proposal differs fundamentally from the EPA regulations that Plaintiffs criticize for "underestimat[ing]" the future costs and benefits of controlling air pollution. Not only does the proposed rule not purport to rely on discounted future GHG impacts, but it does not seek to regulate future GHG impacts at all. On the contrary, it seeks "to repeal" certain GHG emission standards. *Id.* at 36288. If anything, this proposal boosts our confidence that assuming the EPA will issue future GHG regulations is unduly speculative. Our decision does

administration may be more likely to analyze and regulate GHG emissions, federal courts are not in the business of issuing advisory decisions on hypothetical disputes that may or may not materialize in years to come. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). Whether viewed under the rubric of standing or ripeness, Plaintiffs' assumption that the EPA will consider promulgating a GHG regulation in the future requires us to speculate about the future conduct of government actors.

So too does the second link in Plaintiffs' causal chain. It posits that, when considering the future GHG regulation hypothesized above, the EPA will prepare an RIA applying a positive discount rate to future costs and benefits, despite the current administration's guidance against doing so. In addition to directing the EPA to limit its consideration of GHG emissions, the current administration has likewise directed the EPA "not [to] monetize the impacts" of GHG emissions at all, unless required by law (another exception Plaintiffs have not invoked). OMB Guidance at 3.

This causal link also requires us to look past the Discounting Policies' repeated admonitions that cost-benefit analyses must be context-sensitive. The Policies recognize that not all benefits and costs can be expressed "in monetary units." They disclaim the provision of any "rigid blueprint" or formulaic methodology. They provide that economic considerations alone should not govern the decision to discount. And they repeatedly emphasize that agencies like the EPA should exercise "professional judgment" in preparing RIAs. Contrary to Plaintiffs' assertions that the EPA is "require[d]" to apply a positive discount rate when

---

not rely on this point, however, as Plaintiffs raised it for the first time in a footnote on reply.

preparing GHG regulations, the Discounting Policies rebuff that contention on their face.

Plaintiffs counter that the EPA nevertheless has a de facto practice of applying positive discount rates pursuant to the Discounting Policies. They add that a binding, written policy is inessential to challenge a government practice as unconstitutional, and to that we agree. *See Melendres v. Arpaio*, 784 F.3d 1254, 1258–61 (9th Cir. 2015) (affirming finding that defendants' "custom, policy and practice of racially profiling Latino drivers and passengers" violated plaintiffs' constitutional rights (internal quotations omitted)). Yet neither point overcomes the plain text of the Discounting Policies, which acknowledge that discounting is not always possible or desirable, and vest policymakers with discretion to implement positive discounting measures—or not. At minimum, these limitations inject additional uncertainty into Plaintiffs' causal trajectory.

The third link—that the EPA will promulgate a GHG regulation in reliance on discounted future costs and benefits—falters as well. The range of factors that the EPA might consider when issuing regulations is broad and context dependent. The governing statute is of course integral to any regulatory action by the EPA. *See Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007). And the statute may or may not require the EPA to consider future costs. Some provisions of the Clean Air Act, for instance, bar the EPA from considering costs altogether. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) (discussing 42 U.S.C. § 7409(b)(1)). While Plaintiffs cite a 2022 RIA that discounted the future costs and benefits of a proposed rule regarding certain National Ambient Air Quality Standards (NAAQS), the EPA did not consider that RIA when issuing the final rule because, "[i]n setting the NAAQS, the EPA

may not consider the costs" of implementation. Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 16202, 16206 (Mar. 6, 2024) (citing *Whitman*, 531 U.S. at 465–72). Furthermore, not all costs are even capable of being monetized (and thus discounted), a limitation particularly salient to environmental regulations.

Even when the applicable statute permits or directs the EPA to consider costs, "agencies consider a great number of other factors in determining when, what, and how to regulate or take agency action." *Missouri v. Biden*, 52 F.4th 362, 370 (8th Cir. 2022) (internal quotations omitted). Otherwise put, "[a] panoply of reasons can underlie a regulation." *Louisiana v. Biden*, 64 F.4th 674, 682 (5th Cir. 2023). The "benefits" the EPA might consider are defined in sweeping terms to include promoting an efficient economy, enhancing health and safety, protecting the environment, and eliminating discrimination. E.O. 12866 §§ 1(b)(6), 6(a)(3)(C)(i). And recall that a contemplated regulation need not produce a positive return on the Government's investment to come to pass—its "benefits" need only "*justify* its costs." *Id.* § 1(b)(6) (emphasis added). Complicating matters further, presidential administrations tend to weigh the relative costs and benefits of a potential GHG regulation differently. *See* Unleashing American Energy, 90 Fed. Reg. at 8356–57 (withdrawing prior executive order directing the EPA to "capture the full costs of greenhouse gas emissions").

For all these reasons, we agree with our sister circuit that an agency like the EPA's "actual rulemaking considerations . . . are not determinable in advance." *Louisiana*, 64 F.4th at 682. Whether the EPA can or will consider an RIA "when crafting a future regulation"—and how exactly the EPA

might do so—"is mere conjecture." *Id.* Granted, an RIA that discounts future benefits could discourage the EPA from adopting a more ambitious GHG regulation; but there is simply no way to predict how the EPA will rely on some future RIA's costs-and-benefits projection, nor any guarantee the EPA will rely on such hypothetical projections at all.[11]

Even if none of these three causal links is sufficiently speculative to doom Plaintiffs' theory of traceability on their own, their sum total—and the resulting multi-link "chain of possibilities"—would still render Plaintiffs' causal theory too attenuated to pass muster. *Clapper*, 568 U.S. at 410. The Discounting Policies, in other words, are "[too] far removed" from the distant "ripple effects" that reach Plaintiffs to "establish Article III standing." *All. for Hippocratic Med.*, 602 U.S. at 383. Only by stacking one "hypothetical assumption[]" on top of another can we deduce that those Policies, or the Government's alleged discounting practice, will inflict any future harm on the young plaintiffs before us. *ASARCO*, 490 U.S. at 614.

Our sister circuits have recently rejected similar standing theories on similar grounds. In *Louisiana*, the Fifth Circuit dismissed a lawsuit challenging the Biden Administration's executive order convening an interagency group, directing it to quantify the "social cost" of GHG emissions, and requiring federal agencies to use those quantifications when preparing RIAs. *See* 64 F.4th at 677 (citing E.O. 13990). The court held that the plaintiffs lacked standing because their theory of liability relied "on a chain of hypotheticals:

---

[11] We need not address the remaining links in Plaintiffs' proposed causal chain to conclude that Plaintiffs' alleged environmental injuries are not fairly traceable to the governmental conduct they challenge.

federal agencies may (*or may not*) premise their actions on the [RIA's conclusions] in a manner that may (*or may not*) burden the States." *Id.* at 677–78. "[T]he mere 'possibility of regulation'" is not enough to create standing, however. *Id.* at 682. *See also Missouri*, 52 F.4th at 368 (rejecting challenge to the same executive order for want of standing because plaintiffs' challenge depended on speculative assumptions that "at some point in the future," an agency "will 'inevitably' issue one or more regulations that rely in some way upon the [RIAs]," and "that this yet-to-be-identified regulation will then harm [p]laintiffs" in a concrete way).

We find these cases persuasive and their reasoning instructive. The same problems defeat Plaintiffs' standing theory here: whether the EPA will take some future regulatory action in reliance on some future RIA containing GHG estimates to which Plaintiffs might object remains to be seen. Like in *Louisiana* and *Missouri*, Plaintiffs' theory hinges "on a highly attenuated chain of possibilities" that does not suffice for Article III standing. *Louisiana*, 64 F.4th at 682 & n.43 (quoting *Clapper*, 568 U.S. at 410–11); *Missouri*, 52 F.4th at 368 (same).

Plaintiffs' attempt to differentiate these cases is unavailing. They observe that both involved "pre-enforcement" challenges to regulations that had not yet been implemented, creating "uncertainty" over whether the future regulations would cause the States any harm. That is no distinction at all, however. Since Plaintiffs seek injunctive relief, they must demonstrate a threat of future harm. *Summers*, 555 U.S. at 493. Their requested remedy therefore turns on a projection that the EPA will promulgate future regulations in reliance on RIAs containing discounted future costs and benefits. In that sense, Plaintiffs' case is also a

"pre-enforcement" challenge, albeit one targeting hypothetical future regulations the EPA is not (to our knowledge) contemplating. In this case no less than *Louisiana* and *Missouri*, there is considerable "uncertainty" over whether these speculative future regulations will cause Plaintiffs harm.

Equally meritless is Plaintiffs' effort to analogize their case to *Diamond Alternative Energy*. Causation was not "meaningfully dispute[d]" in that matter. 606 U.S. at 113. The plaintiffs-fuel producers challenged specific regulations imposing GHG emissions standards, "the entire purpose of" which was "to reduce the use of gasoline and other liquid fuels in motor vehicles." *Id.* at 112. The regulations required automakers to "produce fewer gasoline-powered vehicles," which in turn lowered "gasoline sales, leading to a monetary injury in fact for producers of gasoline and other liquid fuels," like the plaintiffs. *Id.* at 112–13. Unlike the sprawling and speculative causal theory posited by Plaintiffs here, the *Diamond Alternative Energy* plaintiffs' theory rested on "predictable, commonsense inferences." *Id.* at 116.

## III. Circuit precedent forecloses Plaintiffs' request for declaratory relief.[12]

Plaintiffs seek a declaration that the Government's Discounting Policies violate their rights under the Fifth

---

[12] There is a threshold question whether Plaintiffs raised this issue given that their notice of appeal failed to mention the dismissal order that drew this conclusion. Such an omission does not preclude us from considering an issue, however, where the appellant's intent to appeal the issue can be fairly inferred and the appellee would suffer no prejudice. *West v. United States*, 853 F.3d 520, 523 (9th Cir. 2017). Both prongs are met. Plaintiffs' intent was clear, as they raised the issue in their opening brief.

Amendment.  The district court rejected this remedy in its initial dismissal order, holding that a declaration of that nature is "unlikely to redress" Plaintiffs' alleged injuries. That conclusion, the court reasoned, followed inescapably from our decision in *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020).  We agree.

*Juliana* is a strikingly similar lawsuit brought by another group of young plaintiffs, alleging that federal policies over several decades caused climate change, which in turn inflicted diffuse harms on the plaintiffs, including property damage, physical injuries, and psychological harm.  *Id.* at 1170.  Like Plaintiffs here, the *Juliana* plaintiffs sought a declaration that the Government's policies violated their rights to due process and equal protection under the Fifth Amendment.  *Id.* at 1165, 1170.  Our court rejected the remedy on redressability grounds, however, holding that a declaration of that nature was "unlikely by itself to remediate [the plaintiffs'] alleged injuries absent further court action." *Id.* at 1170.

The district court correctly determined that "*Juliana* is on all fours with this action."  We see no daylight between the declaratory-judgment remedy sought by the plaintiffs there and the declaratory-judgment remedy sought by Plaintiffs here.  Although *Juliana* did not involve the Discounting Policies at issue here, that is a distinction without a difference.  The *Juliana* plaintiffs challenged federal policy far more sweeping in scale, including the Government's decades-long practices of permitting, authorizing, and subsidizing fossil fuel extraction,

And, although the Government's answering brief did not address the question directly, the Government nevertheless had an opportunity to do so.  *See id.* at 524.

development, consumption, and exportation, thus causing "atmospheric $CO_2$ concentrations to escalate to levels unprecedented in human history." *Juliana v. United States*, 339 F. Supp. 3d 1062, 1071 (D. Or. 2018), *rev'd and remanded*, 947 F.3d 1159.

If a declaration that conduct of this nature violated the plaintiffs' rights is "unlikely" to remedy their injuries "absent further court action," *Juliana*, 947 F.3d at 1170, the same is true of a declaration holding unconstitutional non-binding regulatory guidance encouraging federal agencies to discount future costs and benefits. Issuing the declaration sought would merely beg the question: now what? Absent a further judicial order, presumably one with more bite,[13] how would a declaration of the targeted policies' unconstitutionality mitigate the young plaintiffs' physical symptoms or property damage? Plaintiffs have supplied no answer. As in *Juliana*, a declaratory judgment of that nature is unlikely by itself to mitigate Plaintiffs' asserted injuries. And "[a]s a three-judge panel of this circuit, we are bound" by that decision. *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013).[14]

---

[13] While a declaratory judgment "may be persuasive" to those whose rights are declared, unlike an injunction, "it is not ultimately coercive." *Steffel v. Thompson*, 415 U.S. 452, 471 (1974).

[14] Tucked into a footnote, Plaintiffs state in passing that *Juliana*'s declaratory-relief holding is "a dead-letter" [*sic*] following the Supreme Court's decisions in *Diamond Alternative Energy* and *Gutierrez v. Saenz*, discussed below. But they fail to explain how either is "clearly irreconcilable" with *Juliana*. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). And "the summary mention of an issue in a footnote, without reasoning in support . . ., is insufficient to raise the issue on appeal." *United States v. Mitchell*, 502 F.3d 931, 953 n.2 (9th Cir. 2007) (citation modified).

If anything, the redressability problem here is greater than the one our court faced in *Juliana*. As Plaintiffs point out, their redressability burden is to "show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury." *Diamond Alt. Energy*, 606 U.S. at 121 (internal quotations omitted). They cannot make that showing. Even if the declaration they seek had the practical effect of discouraging the Government from discounting future costs and benefits of GHG regulations (*see supra* note 13), it would not guarantee—or even increase the likelihood—that the Government will take some future action to mitigate climate pollution. As just discussed, we have no way of knowing whether the EPA will consider any future rules to regulate GHG emissions; whether the anticipated impacts of that proposed rule will be discounted; and whether or how the EPA will rely on those discounted impacts. That being the case, we cannot say that issuing the declaration Plaintiffs seek would cause a "*predictable* chain of events" ultimately mitigating their alleged injuries. *Diamond Alt. Energy*, 606 U.S. at 121 (emphasis added; internal quotations omitted). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Nor does the Supreme Court's recent decision in *Gutierrez v. Saenz*, 606 U.S. 305 (2025) lend Plaintiffs any assistance. *Gutierrez* involved a state prisoner's due-process challenge to a Texas law authorizing DNA testing of evidence, filed against the prosecutor who refused the prisoner testing access. *Id.* at 312. After the district court invalidated one of the law's requirements, the Fifth Circuit dismissed the case for lack of redressability, holding that the

declaratory relief sought was unlikely to result in the prisoner securing DNA testing given the existence of an independent basis for denying the prisoner's request. *Id.* at 313. The Supreme Court reversed. "[T]he redressability inquiry," the Court held, does not amount to "a guess" over whether a favorable decision "will in fact ultimately" bring about the plaintiff's broadest objective. *Id.* at 318. Rather, declaring one aspect of the Texas law unconstitutional would sufficiently redress the plaintiff's injury because it would eliminate the sole reason the prosecutor relied on to refuse the plaintiff access to DNA testing. *Id.* at 318–19. "That a prosecutor might eventually find another reason . . . to deny [his request] does not vitiate his standing to argue that the cited reasons violated his rights." *Id*. at 320.

The case at bar is far afield. Rather than challenging a specific governmental action targeting Plaintiffs directly, Plaintiffs attack non-binding administrative guidance that may or may not be employed in the future to set in motion a lengthy chain of events that will allegedly result in their downstream harm. And rather than concluding that Plaintiffs' asserted harm is not redressable because some distinct harm is legally deficient, we hold that Plaintiffs have no declaratory-judgment remedy because it is unlikely to mitigate the only asserted injuries at issue. Though we agree with Plaintiffs that the redressability analysis must not turn on guesswork, *id.* at 318, it is they who fail this requirement. Speculation is the only pathway to conclude that declaratory relief will remedy their asserted injuries.

## IV. Granting Plaintiffs further leave to amend the complaint would be futile.

Plaintiffs contend the district court abused its discretion by denying them further leave to amend their complaint.

Their reasoning is twofold: the district court only granted them a single repleading opportunity; and, further, when the court initially dismissed their complaint, it did so on redressability grounds whereas the court's second dismissal order turned on injury-in-fact and causation defects. Both premises are correct, but the conclusion Plaintiffs urge does not follow.

We consider various factors when assessing whether the district court appropriately denied leave to amend, including "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989). We do not accord these factors equal weight, however.

"Futility of amendment can, by itself, justify the denial of . . . leave to amend." *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 815 (9th Cir. 2020) (quoting *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)). If repleading would not help the plaintiff stave off dismissal, we "consider amendment futile." *Id.* Where, for instance, the plaintiff fails to identify any new allegations that would cure their complaint's deficiencies, denying leave to amend is appropriate. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1042 (9th Cir. 2011); *see also Wood*, 678 F.3d at 1082 (affirming dismissal of discrimination claim without leave to amend where plaintiff failed to identify any facts reflecting discriminatory intent).

That is just the case here. In denying Plaintiffs leave to amend for a second time, the district court held that further amendment would be futile in light of "the structural" deficiencies inherent to Plaintiffs' standing theories. We

share the district court's view that Plaintiffs' theories have deep, fundamental flaws at odds with principles of Article III standing. And, when faced with such criticism in the district court—and even a warning that Plaintiffs' first repleading opportunity would be their last—Plaintiffs failed to assuage the district court's concerns. They did not, for instance, identify any new allegations they could plead that would avert a third dismissal order.[15] We therefore decline to disturb the district court's exercise of discretion. *See Cervantes*, 656 F.3d at 1042; *Wood*, 678 F.3d at 1082.

## CONCLUSION

The district court's order dismissing Plaintiffs' case without leave to amend the complaint is **AFFIRMED**.

---

[15] Before our court, Plaintiffs state in conclusory form that they can plead "more detailed allegations" about the purported discrimination. But they neither identify the allegations nor explain how "more detailed allegations" might salvage their equal protection theory. Besides, if Plaintiffs have unpleaded allegations that might save their case, their chance to say so was before the district court with discretion to grant them leave to replead. Our role is to review the district court's exercise of that discretion—not to analyze the issue in the first instance. *See Wood*, 678 F.3d at 1080, 1082; *cf. White v. Martel*, 601 F.3d 882, 885 (9th Cir. 2010) (arguments not made to the district court are generally forfeited).

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**Information Regarding Judgment and Post-Judgment Proceedings**

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate electronic filing system or, if you are a pro se litigant or an attorney with an exemption from the electronic filing requirement, file one original motion on paper.

**Petition for Panel Rehearing and Petition for Rehearing En Banc (Fed. R. App. P. 40; 9th Cir. R. 40-1 to 40-4)**

**(1) Purpose**
   **A. Panel Rehearing:**
   - A party should seek panel rehearing only if one or more of the following grounds exist:
     - ➤ A material point of fact or law was overlooked in the decision;
     - ➤ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
     - ➤ An apparent conflict with another decision of the Court was not addressed in the opinion.
   - Do not file a petition for panel rehearing merely to reargue the case.

   **B. Rehearing En Banc**
   - A party should seek en banc rehearing only if one or more of the following grounds exist:
     - ➤ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
     - ➤ The proceeding involves a question of exceptional importance; or

Post Judgment Form - Rev. 8/2025

> ➢ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2) Deadlines for Filing:**
- A petition for rehearing or rehearing en banc must be filed within 14 days after entry of judgment. Fed. R. App. P. 40(d).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(d). The deadlines for seeking reconsideration of a non-dispositive order are set forth in 9th Cir. R. 27-10(a)(2).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- See Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-4.

**(3) Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

2

Post Judgment Form - Rev. 8/2025

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- Attorneys must file the petition electronically via the appellate electronic filing system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-8000.

**Petition for a Writ of Certiorari**
- The petition must be filed with the Supreme Court, not this Court. Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov.

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ➢ Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista, maria.b.evangelista@tr.com);
  - ➢ **and** electronically file a copy of the letter via the appellate electronic filing system by using the Correspondence filing category, or if you are an attorney exempted from electronic filing, mail the Court one copy of the letter.

3

Post Judgment Form - Rev. 8/2025

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)** [                    ]

**Case Name** [                    ]

Name of party/parties requesting costs to be taxed:

[                    ]

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature** [                    ] **Date** [                    ]

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee/Appeal from District Court filing portion of fee ($5) | | | | $ |
| | | | **TOTAL:** | $ |

***Example:*** *Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*